[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-12071
_____

Agency No. A096-278-321


PUTU INDRAWATI,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.


_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

(March 2, 2015)

Before TJOFLAT, JULIE CARNES and GILMAN,* Circuit Judges.

TJOFLAT, Circuit Judge:

_____

* The Honorable Ronald Lee Gilman, United States Circuit Judge for the United States Court of Appeals for the Sixth Circuit, sitting by designation.

Putu Indrawati petitions for review of the Board of Immigration Appeals'

("BIA") order affirming the Immigration Judge's ("IJ") decision that she is barred

from adjustment of status because she knowingly filed a frivolous asylum

application.[1]  Indrawati raises three claims.  First, she argues that the IJ denied her

a sufficient opportunity to account for any discrepancies or implausible aspects of

her claim, in contravention of *In re Y-L-*, 24 I. & N. Dec. 151 (2007).  Second, she

argues that the IJ's reliance upon three documents—a photocopy of a ten page

addendum to her I-589 application for asylum, an Immigration and Naturalization

Service ("INS") memorandum recounting an interview conducted with Indrawati's

mother, and a memorandum detailing asylum fraud committed by the man who

handled Indrawati's application—violated her right to due process.  Third, she

argues that the BIA's decision reflects a lack of reasoned consideration.

---

[1]  An alien who knowingly makes a "frivolous" asylum application is permanently ineligible for all benefits under the Immigration and Nationality Act ("INA"), *see* 8 U.S.C. § 1158(d)(6), except withholding of removal, 8 C.F.R. § 1208.20.  An asylum application is frivolous "if any of its material elements is deliberately fabricated."  8 C.F.R. § 1208.20.

Although the BIA has (correctly) noted that, in this context, "fraudulent" might be a more appropriate term than "frivolous."  *In re Y-L-*, 24 I. & N. Dec. 151, 155 n.1 (2007), important distinctions exist between these terms.  An application is "fraudulent" if "[t]here is a showing of fraud in the alien's application such that he or she was not eligible for asylum at the time it was granted."  *See* 8 C.F.R. § 208.24(a)(1).  Finding that an application is fraudulent is grounds only to revoke asylum; that finding does not necessarily bar the applicant from receipt of other relief under the INA.  *See id.*  A fraudulent application is also frivolous only if, after comporting with procedural steps outlined in *In re Y-L-*, the IJ makes a finding that the applicant submitted the application *knowing* that it contained a material falsehood.

In other words, all frivolous applications are fraudulent, but not all fraudulent applications are frivolous.

We conclude that we are without jurisdiction to consider Indrawati's arguments regarding the sufficiency of her opportunity to account for discrepancies and implausible aspects of her claim. We are also without jurisdiction to consider her due process argument concerning the INS memorandum. Moving to the merits, we find unavailing her remaining due process claims, along with her claim that the BIA's decision lacks reasoned consideration. Accordingly, we dismiss in part and deny in part her petition for review.

I.

A.

Putu Indrawati, an ethnically Chinese Christian, was born in Indonesia in 1974. In 1998, she entered the United States legally as a tourist. Sometime thereafter, she enrolled in community college in Gainesville, Florida. Although she originally intended to return permanently to Indonesia upon graduation, her plans shifted following an incident in December 2000. At that time, Indrawati returned to Indonesia to attend her grandmother's funeral and to obtain an F-1 student visa so that she could continue studying in the United States. According to Indrawati, she went shopping with a friend in a Surabaya[2] mall after acquiring her visa. As she entered the parking lot to leave, a group of Indonesian men assaulted

---

[2] Surabaya is the capital of Indonesia's East Java province. It is the second-largest city in Indonesia.

3

her and her friend.  The men shouted ethnic slurs at Indrawati, and one choked her. Indrawati screamed, and the men scattered.[3]  Although Indrawati did not alert the authorities, she immediately told her parents about the ordeal.

This incident, combined with encouragement from Herlina Suherman—a fellow ethnically-Chinese Christian student[4] that Indrawati described as "pretty much the closest friend that I had in the U.S."—convinced Indrawati to apply for asylum.  Suherman explained that her boss, Hans Gouw, could help Indrawati. Gouw was a purportedly upstanding member of the immigrant Chinese-Indonesian community.  He led the Chinese Indonesian American Society and had helped Suherman acquire asylum.  Suherman explained that Gouw could help Indrawati too—for a fee.  Although she could read and write English and presumably could have completed the I-589 form personally, Indrawati—like so many others confronted by impenetrable government forms—relied on a third party's expertise. Suherman and Gouw were on the case.

---

[3] Indrawati adopted this version of the Surabaya assault before Asylum Officer Conwell, Immigration Judge Wilson, Immigration Judge Karden, the BIA, and this court.  We assume, *arguendo*, the accuracy of her rendition of the facts.

[4] Indrawati met Suherman in Gainesville.  At that time, Suherman attended the University of Florida.  She later moved to Michigan to work for Gouw.  Her current whereabouts are unknown.

According to Indrawati, her involvement in the application filing process was minimal. She signed a blank I-589[5] and truthfully answered biographical questions Suherman posed to her over the telephone. Indrawati also provided Suherman with her birth certificate, passport, and money to pay for Gouw's assistance. Suherman and Gouw would apparently use this information to file a true and correct asylum application; all Indrawati would have to do was attend an asylum interview. That Indrawati would not see her application prior to the interview evidently bothered her not.

On January 27, 2003, the INS received the application. The enclosed Form I-589 Application for Asylum and Withholding of Removal revealed that Indrawati sought asylum based upon her ethnicity and religion. The I-589 alleged that Indrawati had "long been subject to persecution" by Muslim-Indonesian extremists because she was a Chinese Christian. It also (falsely) stated that many of Indrawati's "Chinese and Christian friends have been persecuted, tortured and killed in the past few years, since 1998." The completed I-589 form did not mention the Surabaya assault that allegedly precipitated Indrawati's pursuit of asylum. This was not a surprising omission given the form's instruction to "attach

---

[5] The form Indrawati signed contained warnings that the application was certified under penalty of perjury and that "[a]pplicants determined to have knowingly made a frivolous application for asylum will be permanently ineligible for any benefits" under the INA.

5

documents evidencing . . . the specific facts on which you are relying to support your [asylum] claim."

Indeed, appended to the completed form was a ten-page statement ("Statement") that recounted two events supporting Indrawati's asylum claim. The first event was an embellished version of the Surabaya assault. Whereas the actual event involved only ethnic slurs and choking, the Statement recounted a sexual assault. According to the Statement, Indrawati's assailants stripped her and knocked her unconscious, resulting in her hospitalization. The Statement's second event was entirely fabricated. It detailed an attack on a Christian prayer meeting at Indrawati's home. Twenty Muslim men allegedly broke into Indrawati's house, beat her father and the pastor, and threatened the entire group with further reprisal should they continue to practice Christianity. In reality, Indrawati's parents were Buddhists and there was never any prayer meeting or attack at their home.

In response to her application, the INS scheduled an asylum interview with Indrawati. On March 20, 2003, Asylum Officer Miguel Rodez conducted the interview. Although Rodez unquestionably possessed the Statement, the parties dispute whether or not he relied upon or referenced its contents at the interview.[6] Neither party, however, disputes that Rodez questioned Indrawati regarding her I-

---

[6] This dispute is perhaps the heart of this case's frivolousness determination. Because Rodez did not note that Indrawati's testimony was inconsistent with her application (which includes the Statement), the inference is that, if Rodez *did* ask questions about the Statement, Indrawati testified consistently with the Statement's contents, and thus testified falsely.

589, made corrections to that form (along with red checkmarks), and took three pages of handwritten notes.

In these notes, Rodez placed a checkmark indicating that Indrawati had not "received medical attention." This directly conflicted with the Statement's assertion that Indrawati was hospitalized following the Surabaya assault. His notes also stated that Indrawati's worst problem occurred in 2000 at a mall and that "2 men tried to rape her." Rodez also wrote that Indrawati's "story conforms to I[-]589 statement[,] see attached."

A week later, Rodez wrote a report recommending a grant of asylum. By this point, Rodez's copy of the Statement was replete with red checkmarks like those on the I-589. His recommendation's reliance upon the indisputably fraudulent Statement was manifest. He referenced the two incidents detailed in the Statement and quoted dialogue contained therein verbatim. On the basis of his recommendation, the INS approved Indrawati's application for asylum.

### B.

Five years later, Indrawati received a Notice of Intent to Terminate Asylum Status featuring the proclamation that the United States Citizenship and Immigration Service ("USCIS") had "information from a reliable source indicating that you did not have any problems in Indonesia and that you fabricated your asylum claim." Unbeknownst to Indrawati, the evidence in question was a

7

memorandum penned by the INS's Texas Service Center ("TSCM") detailing an Anchorage, Alaska interview with Indrawati's mother. Officials questioned her mother as she was en route to visit Indrawati. According to this memorandum—prepared months after the Anchorage interview—Indrawati's mother allegedly told immigration officials that she knew of nothing that would have prompted her daughter to seek asylum.[7] Furthermore, the mother stated that Indrawati applied for asylum on the advice of a classmate.

Though Indrawati said she was aware of no fraud in her application, if there *was* fraud, she had a guess as to its origin. Years earlier, Indrawati learned that Herlina Suherman, her closest friend, had run into legal troubles. Although Indrawati and Suherman "talk[ed] about pretty much anything and everything," Suherman had apparently kept secret her participation in an asylum fraud ring. In 2004, the Department of Justice announced an indictment charging Suherman with asylum fraud. That indictment also charged Hans Gouw—Suherman's boss and the man who all parties agree handled Indrawati's asylum application for a fee—with the same crime.

Indrawati also learned that, while Suherman remained a fugitive, Gouw had subsequently pleaded guilty to charges of conspiracy to commit immigration fraud,

---

[7] In her July 2009 testimony, Indrawati stated that she immediately told her parents about the (true rendition of the) Surabaya assault. She stated the same in her September 2011 testimony.

conspiracy to commit identification fraud, conspiracy to commit sex trafficking, and money laundering. It turned out that Gouw's Chinese Indonesian American Society was a profitable front for massive immigration fraud. Indrawati thus assumed that any problems with her asylum application were the result of meddling by Suherman and Gouw.

The USCIS's notice directed Indrawati to appear for an interview at the Miami Asylum Office on September 10, 2008, to determine whether her application was fraudulent. Asylum Officer Patricia Conwell conducted the interview. Indrawati explained that she applied for asylum on Suherman's advice and that her only tangible involvement in her I–589 application began and ended with her signature. Indrawati maintained that she had never seen the Statement and that Rodez never questioned her about anything besides the contents of the I-589 form.

Indrawati also explained that the Surabaya incident was the only physical attack she had ever suffered (though she did note that "[o]ther things happened like I had to pay triple for passport" because of her ethnicity). She also admitted that someone had given her "a brown paper envelope before the interview and told [her] to submit it to the officer." Regardless, she explained that she never investigated the envelope's contents. To conclude the interview, Indrawati's

9

attorney told Officer Conwell that "[a]ny alleged fraud was not on applicant's part."

Conwell found that Indrawati had submitted a fraudulent asylum application. Furthermore, she found that the unembellished choking incident did not rise to the level of persecution necessary for asylum eligibility. *See* 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(A). The USCIS therefore terminated Indrawati's asylum, pursuant to 8 C.F.R. § 208.24(a)(1),[8] on October 2, 2008.

## C.

Four days later, the INS commenced removal proceedings against Indrawati, alleging that she had "procured asylum in the United States by fraud or by willfully misrepresenting a material fact" and charging her with violations of 8 U.S.C. §§ 1227(a)(1)(A)–(B) and 1182(a)(6)(C)(i). Removal proceedings began on December 10, 2008, before Immigration Judge Earle Wilson. Judge Wilson heard evidence,[9] sustained the charge of removability under 8 U.S.C. §§ 1227(a)(1)(A)–(B), and found that Indrawati had filed a frivolous application.[10] This, however,

---

[8] That regulation provides, in relevant part, that "an asylum officer may terminate a grant of asylum made under the jurisdiction of USCIS if, following an interview, the asylum officer determines that . . . there is a showing of fraud in the alien's application such that he or she was not eligible for asylum at the time it was granted."

[9] Judge Wilson heard in-person testimony from Indrawati and telephonic testimony from Officers Rodez and Conwell.

[10] In his oral decision, Judge Wilson found that Indrawati testified falsely at her asylum interview and that her application was "frivolous in that [Indrawati] submitted the application knowing that it contained false and misleading information."

10

did not end the case.  Because Indrawati could still seek withholding of removal, [11] Judge Wilson adjourned the case to allow her the chance to file a second petition.

Indrawati did just that, filing a second application for asylum and withholding of removal.  She additionally filed a petition to adjust her status based upon her recent marriage to a United States Citizen.  Before any of these applications were resolved, Immigration Judge Stuart Karden replaced Judge Wilson.  Judge Karden then exercised his authority to rehear the frivolousness issue.

By the time Judge Karden was ready to rehear that issue, Indrawati had withdrawn her second application for asylum and withholding of removal.  This left only her petition for adjustment of status.  Because a frivolousness finding would preclude adjustment of status, *see* 8 U.S.C. § 1158(d)(6), Judge Karden set out to immediately make that determination.  In deciding this issue, Judge Karden heard testimony from three individuals and received documentary evidence.  He first heard from Officer Rodez.  Although he could not recall the specifics of Indrawati's interview, Rodez testified as to his general practices in conducting asylum interviews.  Most importantly, he noted that he would generally place

---

[11] A frivolousness finding does not preclude an alien from seeking withholding of removal.  8 C.F.R. § 1208.20.

checkmarks above specific facts in an application after having verified that information with the applicant during the interview.

Officer Conwell testified next. Conwell confirmed that Indrawati admitted that the Statement was fraudulent. Conwell also noted that it was unusual for an asylee to admit to fraudulent components of an asylum application. Additionally, Conwell testified that she believed Indrawati to be truthful at her termination interview. What Conwell meant by this was (and is) ambiguous. [12] On the one hand, Conwell may have meant that she believed Indrawati's claim that Indrawati had never seen the Statement and had answered all of Rodez's questions truthfully.

_____

[12] The following exchange between Judge Karden and Officer Conwell highlights this ambiguity:

IJ:         Now, as you know, obviously, a big part of this is who created the statement? Did she know about the statement, et cetera. When you said you felt she was truthful when you did the interview, now obviously you don't know what she's thinking but at least the way that you evaluated [Indrawati's] testimony part of it was that she told you that she had never seen this statement before. At the time did you believe that?

CONWELL:    I think more of my thoughts of her being truthful are that she said this didn't happen, this didn't happen and that didn't happen. So I don't know that I really examined that thought so carefully.

IJ:         All right. So when you said there was—

CONWELL:    But she seemed honest that day.

IJ:         Okay.

CONWELL:    I mean, it's just, you know, you interview people and you say they are being honest or not and you know.

On the other hand, Conwell may have meant that she believed Indrawati's assertion that the events chronicled in the Statement never occurred.

Finally, Indrawati testified. She stated that she remembered the interview and that Rodez never questioned her regarding information contained within the Statement. She testified that she had answered all of Rodez's questions truthfully and that she first learned about the Statement and its falsehoods when confronted by Conwell. She also reiterated that her only involvement in filing her application began and ended with signing a blank I-589 and relating truthful information to Suherman, whom she entrusted to accurately complete the form.

Judge Karden also considered documentary evidence,[13] beginning with a color photocopy of the Statement. This copy showed the checkmarks that Rodez allegedly placed as he interviewed Indrawati. During the hearing, Indrawati requested access to the original Statement, claiming that she could use it to demonstrate that the checkmarks were made after the interview. If proven, this would have eliminated perhaps the strongest evidence for finding fraud. Indrawati, however, did not explain how she would (or could) use the original Statement to date Rodez's checkmarks. After authenticating the document with Rodez, the IJ

---

[13] There were additional exhibits beyond those covered here. We discuss only those documents that figure prominently in this appeal.

13

admitted the photocopy of the Statement without requiring the government to produce the original.

Judge Karden also considered the TSCM, the document that precipitated the revocation of Indrawati's asylum.  The TSCM recounted that Indrawati's mother stated that she did not know why her daughter would claim asylum.  He also considered an affidavit by Indrawati's mother disputing the TSCM's accuracy.  Indrawati's mother stated that she had been mistranslated and that Indrawati had encountered serious difficulty in Indonesia on account of her race and religion.

Finally, Judge Karden considered the Fraud Verification Memo ("FVM").  As mentioned earlier, Hans Gouw completed and filed Indrawati's application.  Pursuant to his guilty plea to asylum fraud (among other things), Gouw participated in a three-day interview in 2006 in which he outlined to federal agents the procedures he used to procure asylum for his customers.  The FVM memorialized the findings of that interview.  The government introduced the FVM ostensibly to impeach Indrawati after she testified that she had never spoken with Gouw, attended practice sessions for her asylum interview, or consented to fraud.

Some of the FVM's details contradicted Indrawati's narrative.  For example, Gouw claimed that he (or his associates) coached individual applicants so that they could testify credibly and consistently with their fraudulent asylum applications.

14

He also stated that his organization obtained the applicant's consent before submitting a fraudulent application.

Other details irrelevant to impeachment conformed to Indrawati's narrative, thus bolstering the FVM's reliability. Gouw stated that applicants who had paid "a sufficient amount of their outstanding fee" were provided with a copy of all documents submitted on their behalf. Indrawati had earlier testified that she paid Gouw a fee and that she had received a brown envelope (perhaps containing her application) prior to her interview. Gouw also stated that, where an applicant indicated an actual account of discrimination or harm, he would embellish that event to "dramatize" what had happened. The Statement indisputably contained a dramatized version of the Surabaya assault.

Still other details, however, appeared to weaken the Government's case. For example, although Gouw named many of the asylum applicants he helped, he did not mention Indrawati. Finally, some details were irrelevant or of little probative value. For example, the FVM recounted that Gouw listed false addresses for asylum applicants to ensure that asylum interviews occurred during circuit rides.[14]

---

[14] Many asylum interviews occur at the asylum officer's office. In such circumstances, the officer will generally conduct one to two interviews per day. However, asylum officers will also travel to conduct interviews. For example, although Officer Rodez was stationed at the Miami Asylum Office, he also conducted interviews in Jacksonville, Puerto Rico, and St. Thomas. These on-location interviews are called "circuit rides." While on a circuit ride, asylum officers generally conduct five to six interviews per day. Because an officer must conduct many more interviews than usual while on a circuit ride, there is the possibility that circuit-ride interviews will be less thorough than interviews conducted at his office.

Although Indrawati's interview took place on a circuit ride, no one contended that she used a fraudulent address. Gouw also stated that he sometimes created false identification documents for his applicants. No one, however, ever alleged that any of Indrawati's documentation was fraudulent.

Ultimately, Judge Karden credited Rodez's testimony as to the method that Rodez used when conducting asylum interviews. Rejecting Indrawati's argument that Rodez must have checkmarked the Statement following their interview, Judge Karden, like Judge Wilson before him, found that Rodez checkmarked an application only during the asylum interview—and in response to the asylee's answers. Because the Statement had checkmarks, he concluded that Rodez must have questioned Indrawati concerning the material therein and received answers conforming to the Statement. Accordingly, Judge Karden found that Indrawati knowingly testified falsely to material facts at her asylum interview; that is, she knowingly filed a frivolous application for asylum.[15]

Judge Karden bolstered this conclusion by referencing Conwell's finding that Indrawati's application was fraudulent, along with the FVM's assertion that Gouw would coach his applicants so that they could testify convincingly at their asylum hearings. He noted that Gouw had a strong interest in prepping his

---

[15] Although the Government did not rely upon this provision, we note that an applicant's "signature [on an asylum application] establishes a presumption that the applicant is aware of the contents of the application." 8 C.F.R. § 1208.3(c)(2).

16

customers to ensure they had smooth asylum interviews.  His fraudulent asylum

enterprise would collapse—and therefore expose him  to criminal prosecution—if

applicants testified inconsistently with their applications.  Having found that the

Government met its burden of proof by a preponderance of the evidence that

Indrawati had knowingly submitted a frivolous asylum application, Judge Karden

ordered her removed and found her ineligible for either adjustment of status or

voluntary removal.

## D.

In her appeal to the BIA, Indrawati challenged Judge Karden's frivolousness

finding on two grounds.[16]  First, she contended that the Government had not

proven by a preponderance of the evidence that Indrawati had knowingly filed a

frivolous asylum application.  Indrawati's attorney stated that "[t]he only evidence

in the entire record to show that Mrs. Indrawati was asked the questions on the ten

---

[16] In her notice of appeal from the IJ's decision, Indrawati presented her arguments as follows:

> The decision of the Immigration Judge was contrary to the law, the facts, and the evidence.

> The government failed to meet its burden of showing by a preponderance of the evidence that the respondent had knowingly and deliberately filed a frivolous asylum application.

> The immigration judge committed serious errors of law in the admission of documentation that was highly prejudicial to the respondent and was not provided to respondent as required by the local rules.  Furthermore, the judge would not permit respondent or her attorney to examine the original I-589 application and Supplement, which was necessary to ascertain the authenticity of the markings made by the asylum officer at the time of respondent's asylum interview.

page attachment are yellow highlights, red lines, and red checkmarks made by Officer Rodez." As she had below, she claimed that the red checkmarks were made a week after the interview, and that, if proven, this "would have established that Mrs. Indrawati was truthful when she stated that Mr. Rodez never asked her the questions on the attachment to the asylum application during her interview." Although couched in language concerning burdens of proof, most of Indrawati's arguments quibbled with the weight given to and conclusions drawn from various pieces of evidence.[17]

Second, she contended that the Government's refusal to allow her to view the original check-marked Statement, along with Judge Karden's reliance upon that document and the FVM, denied her due process. According to Indrawati, "[a] review of the original [I-589 and Statement] would have shown that the red checkmarks made by the asylum officer were not made at the asylum interview," and that her inability to review that document rendered the hearing fundamentally unfair. To contest the FVM's admission, she cited to cases holding that reliance upon documents containing multiple levels of hearsay—and the FVM surely did contain double hearsay—violates due process. Indrawati also contested the FVM's

---

[17] For example, Indrawati argued that "[t]he only indicia of knowingly fabricating evidence is a document (not prepared by Mrs. Indrawati, not submitted by her, and not signed by her) containing markings by an asylum examiner which, based on the totality of the evidence, indicates that it was prepared one week after the date of the interview." Indrawati went on to explain that, "[i]f all the facts in the case are evaluated fairly," the Government would not have met its burden.

18

reliability by noting discrepancies between how her application was filed and Gouw's filing *modus operandi*.  Overall, Indrawati contended that, had neither the check-marked Statement nor the FVM been considered, "there would have been a different outcome because the government would not have been able to prove their case by a preponderance of the evidence."

### E.

The BIA dismissed her appeal.  It disagreed that the Government failed to meet its burden of proving by a preponderance of the evidence that Indrawati knowingly submitted a frivolous asylum application.  It stated that the IJ's decision to credit Rodez's testimony (and discredit Indrawati's testimony) was not clearly erroneous, and that Rodez's testimony demonstrated that Indrawati "testified to [Rodez] consistently with [the Statement's] contents."  The BIA also noted that Conwell's termination interview with Indrawati "confirmed that nothing in Officer Rodez's notations from the asylum interview was true except for a choking incident."  The BIA further stated that the FVM, which reflected that Gouw did not file fraudulent applications without first obtaining the applicant's consent, supported the IJ's finding that Indrawati had knowingly filed the fraudulent application.

The BIA also dismissed Indrawati's due process arguments.  It noted that Indrawati failed to object properly to the Statement's admission and deemed

19

speculative her arguments that she could prove that Rodez did not make the checkmarks during the asylum interview.  Finally, it noted that the admission of the FVM did not violate due process because she could not show prejudice.  The BIA explained that "there already existed independent evidence, based on the admittedly false statements both in the body of the Form I-589 and in the 10-page attached statement, that the application contained material falsehoods."  The BIA also stated that the FVM was admitted to impeach Indrawati's assertion that she had no knowledge of the Statement prior to—and had not prepared for—her asylum interview.

## II.

Indrawati raises three arguments in her petition for review of the BIA's decision.  First, she claims that the IJ's frivolousness finding was improper because she was denied a sufficient opportunity to account for the alleged discrepancies raised by the color photocopy of the Statement, the TSCM, and the FVM.  Second, she claims that Judge Karden's and the BIA's reliance upon these documents violated her right to due process.  Finally, she argues that the BIA's decision must be set aside because it does not reflect reasoned consideration of the law and facts.

"When, as here, the BIA issues its own opinion, we review only the decision of the BIA, except to the extent the BIA expressly adopts the IJ's decision." *Rodriguez Morales v. U.S. Att'y Gen.*, 488 F.3d 884, 890 (11th Cir. 2007).  We

20

review legal determinations *de novo*. *Ayala v. U.S. Att'y Gen.*, 605 F.3d 941, 948 (11th Cir. 2010). We review administrative fact findings under the highly deferential substantial-evidence test. *Id.* Under this test, we will affirm the BIA's decision "if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Tan v. U.S. Att'y Gen.*, 446 F.3d 1369, 1374 (11th Cir. 2006) (quotation marks omitted). We will reverse findings of fact "only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings." *Id.* (quotation marks omitted).

## III.

Before addressing Indrawati's arguments on the merits, we assess our jurisdiction (or lack thereof). We review our subject matter jurisdiction *de novo*. *Amaya-Artunduaga v. U.S. Att'y Gen.*, 463 F.3d 1247, 1250 (11th Cir. 2006) (per curiam). We lack jurisdiction to review final orders in immigration cases unless "the alien has exhausted all administrative remedies available to the alien as of right." 8 U.S.C. § 1252(d)(1). A petitioner fails to exhaust her administrative remedies with respect to a particular claim when she does not raise that claim before the BIA. *Amaya-Artunduaga*, 463 F.3d at 1250.

This is not a stringent requirement. Simply put, petitioners must have previously argued the "core issue now on appeal" before the BIA. *Montano*

*Cisneros v. U.S. Att'y Gen.*, 514 F.3d 1224, 1228 n.3 (11th Cir. 2008).  Unadorned, conclusory statements do not satisfy this requirement.  Though exhaustion does not require a petitioner to "use precise legal terminology" or provide "a well[-]developed argument to support [her] claim," it does require that she provide information sufficient to enable the BIA to review and correct any errors below. *Arsdi v. Holder*, 659 F.3d 925, 929 (9th Cir. 2011).  Unless a petitioner raises a purely legal question, the BIA cannot review and correct errors without the petitioner first providing her argument's relevant factual underpinnings.  What little we do require furthers two core purposes of the exhaustion requirement: avoiding premature interference with the administrative process and ensuring that the agency "has had a full opportunity to consider a petitioner's claims."  *Amaya-Artunduaga*, 463 F.3d at 1250 (quoting *Theodoropoulos v. INS*, 358 F.3d 162, 171 (2d Cir. 2004)) (quotation marks omitted).

The Government argues that Indrawati failed to exhaust her administrative remedies with regard to whether she had a sufficient opportunity to account for the discrepancies on which the frivolousness finding was based, whether the admission of the TCSM violated her right to due process, and whether the BIA's decision reflects reasoned consideration.  Although we agree with the Government's first two arguments, we cannot agree with the third.

A.

Nowhere did Indrawati's appeal to the BIA mention a lack of "sufficient opportunity" to account for discrepancies and implausible aspects of her claim for asylum. This, however, does not end our inquiry; administrative exhaustion requires no specific incantation. Rather, we must look to the substance of the appeal for facts and allegations that make manifest the petitioner's attempt to raise this claim before the BIA.

The BIA first elucidated the procedural requirements for making a frivolousness finding in *In re Y-L-*, 24 I. & N. Dec. 151 (2007). There, the BIA stated that a frivolousness finding is valid only if there is "an indication that the alien has been afforded sufficient opportunity to account for any discrepancies or implausible aspects of [her asylum] claim." *Id.* at 155. The BIA noted that, to fulfill this requirement, "it would be a good practice" for an IJ to "bring [frivolousness] concern[s] to the attention of the applicant prior to the conclusion of proceedings." *Id.* at 159–60. Explicit warnings, however, are unnecessary if the deliberate fabrication "is so clear on the record that a formal request for an explanation would be a needless exercise." *Id.* at 160 n.3. That being said, if the IJ does warn the applicant at the start of a merits hearing that he is contemplating making a frivolousness finding, the IJ "is not required to afford additional warnings or seek further explanation in regard to inconsistencies that have become

23

obvious to the respondent during the course of the hearing." *In re B-Y-*, 25 I. & N.

Dec. 236, 242 (2010).

Indrawati's brief to the BIA contained nothing resembling a claim that the IJ

blindsided her with the frivolousness finding, thus depriving her of a sufficient

opportunity to account for discrepancies in her application.[18]  Accordingly, we are

without jurisdiction to consider Indrawati's claims on this issue.

### B.

Indrawati also argues that the admission and consideration of the TSCM

violated her right to due process.  Although her appeal to the BIA did argue that

Judge Karden's admission of and reliance upon the photocopied Statement and the

FVM violated her right to due process, the same cannot be said of the TSCM.  Her

appeal did not mention the TSCM anywhere, and the BIA noted as much.[19]  By

failing to make any arguments relating to the TSCM, we can say with certainty that

Indrawati failed to provide the BIA with an opportunity to correct any alleged

errors.  Indrawati accordingly failed to exhaust her administrative remedies with

---

[18] From the start of the hearings under Judge Stuart Karden, it was manifest that the court was considering a frivolousness finding.  Indeed, that was the only issue that Judge Karden considered.

[19] The BIA arguably was on notice that some of Indrawati's claims with respect to the Statement and FVM might be equally applicable to the TSCM.  However, this court has stated that the BIA's *sua sponte* consideration of a claim does not result in exhaustion.  *Amaya-Artunduaga*, 463 F.3d at 1250–51.  If the BIA's unprompted grappling with an issue is not enough to exhaust an administrative remedy, surely the result is identical when the BIA mentions an issue only in passing.

24

respect to all claims concerning the TSCM. *See Amaya-Artunduaga*, 463 F.3d at 1251 (noting that due process claims require exhaustion).

## C.

The Government additionally argues that Indrawati failed to exhaust her claim that the BIA's decision reflects a lack of reasoned consideration. In a reasoned-consideration inquiry, we look to see whether the BIA "consider[ed] the issues raised and announce[d] [its] decision in terms sufficient to enable a reviewing court to perceive that [it has] heard and thought and not merely reacted." *Cole v. U.S. Att'y Gen.*, 712 F.3d 517, 534 (11th Cir. 2013) (quoting *Carrizo v. U.S. Att'y Gen.*, 652 F.3d 1326, 1332 (11th Cir. 2011)) (quotation marks omitted). The Government's jurisdiction argument faults Indrawati for not raising an argument about the lack of reasoned consideration displayed by a decision not yet in existence. This is facially nonsensical. We reject the Government's argument, and conclude that we possess jurisdiction to consider Indrawati's argument on this issue.

## IV.

Indrawati argues that the BIA's reliance on the Statement and FVM violated her right to due process.[20] Although the Federal Rules of Evidence do not apply in

---

[20] The Fifth Amendment entitles petitioners in removal proceedings to due process of law. *See Tang v. U.S. Att'y Gen.*, 578 F.3d 1270, 1275 (11th Cir. 2009).

immigration proceedings, *Gares v. U.S. Att'y Gen.*, 611 F.3d 1337, 1347 (11th Cir. 2010), due process considerations limit the evidence that may be considered. *See, e.g.*, *Banat v. Holder*, 557 F.3d 886, 891 (8th Cir. 2009). To establish a due process violation, petitioners must demonstrate "that they were deprived of liberty without due process of law, and that the asserted errors caused them substantial prejudice." *Lonyem v. U.S. Att'y Gen.*, 352 F.3d 1338, 1341–42 (11th Cir. 2003) (per curiam). The BIA deprives a petitioner of liberty without due process of law when it considers evidence that is not probative and whose admission is not fundamentally fair. *Tashnizi v. INS*, 585 F.2d 781, 782-83 (5th Cir. 1978).[21] When considering the fairness of admitting hearsay, we look to the challenged evidence's reliability and trustworthiness. *See, e.g.*, *Anim v. Mukasey*, 535 F.3d 243, 256 (4th Cir. 2008). To establish substantial prejudice, petitioners "must demonstrate that, in the absence of the alleged violations, the outcome of the proceeding would have been different." *Lapaix v. U.S. Att'y Gen.*, 605 F.3d 1138, 1143 (11th Cir. 2010) (per curiam).

## A.

Indrawati contests Judge Karden's admission of and reliance upon a photocopy of the check-marked Statement without first permitting her to examine

---

[21] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

the original.  Indrawati does not dispute the photocopy's accuracy.  Rather, she maintains that, if she had been given access to the original document, she could have established that Rodez annotated the Statement after his interview with Indrawati.  Her claim necessarily assumes that there is a material difference between the photocopy and original; if there were not, the photocopy would be sufficient.  The BIA dismissed this due process argument as "speculative," stating that "there is no plausible contention that the authenticated photocopy differed from the original."

We agree with the BIA that Indrawati's argument is speculative. At no point has Indrawati advanced any explanation as to what she might actually do with the original Statement that would reveal when Rodez placed the checkmarks.  For example, if there is a test one can perform on ink to determine when a particular mark was inscribed on paper—a test that obviously could only be performed on the original—Indrawati did not bring that test to the attention of the BIA (or this court).  We are left to ponder what, if any, differences might exist between the photocopy and the original (and how one would detect such differences) that could establish when Rodez made the checkmarks.  Furthermore, Indrawati cites no authority requiring the government to produce original documents during removal proceedings.

27

It is indisputable that the check-marked Statement, when evaluated in combination with Rodez's testimony as to his practices as an asylum officer, is probative as to what questions he asked Indrawati.  Because Indrawati offers no explanation as to how the original statement differs materially from the photocopy, we cannot say that reliance upon the photocopy without providing Indrawati an opportunity to examine the original was fundamentally unfair.[22]  Accordingly, we decline to grant her petition on this basis.

B.

Indrawati also argues that admission of the FVM was fundamentally unfair both because the document contained multiple levels of hearsay and because she had no opportunity to cross-examine its author.  However, even if we were to assume that the admission of the FVM was a due process violation,[23] Indrawati

---

[22] Indeed, it is likely that the photocopy would be admissible even if the Federal Rules of Evidence controlled.  Although "[a]n original writing, recording, or photograph is required in order to prove its content," Fed. R. Evid. 1002, "a duplicate is admissible to the same extent as the original unless a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate," Fed. R. Evid. 1003.  Indrawati has not raised a genuine issue regarding the original's authenticity, and, as noted, the circumstances are such that it was fair to admit the photocopy.

[23] We pause to note that—within the immigration context—this circuit has not yet recognized anything resembling a right to confrontation rooted in the Due Process Clause.  Other circuits, however, have recognized such a right.  For example, in *Cinapian v. Holder*, 567 F.3d 1067 (9th Cir. 2009), the Government first disclosed the existence of adverse documentary evidence during Cinapian's immigration hearing—as opposed to disclosing the existence of that evidence beforehand—and made no effort to make the document's author available for cross-examination.  567 F.3d at 1071–72.  The Ninth Circuit held that "the combination of the government's failure to disclose the DHS forensic reports in advance of the hearing or to make the reports' author available for cross-examination and the IJ's subsequent consideration of the

28

cannot demonstrate the requisite substantial prejudice.  *See Lapaix*, 605 F.3d at

1143.  The IJ credited Rodez's testimony that he would not have placed

checkmarks on the document unless he asked questions pertaining to the check-

marked material.  He simultaneously found Indrawati's testimony to the contrary

incredible.  It necessarily flows from this finding that Indrawati, at the very least,

gave false answers at her asylum interview consistent with the information that

formed the basis for Rodez's recommendation to grant Indrawati asylum.[24]  This

reports under these circumstances" denied the petitioner a fair hearing, resulting in a violation of
due process.  *Id.* at 1075.

Explicitly referencing "the right to confront evidence and cross-examine witnesses in
immigration cases," the Ninth Circuit then held that the government "may not use an affidavit
from an absent witness unless [it] first establishes, that, despite reasonable efforts, it was unable
to secure the presence of the witness at the hearing."  *Id.* at 1074 (quotation marks omitted).  The
Ninth Circuit is not alone in crafting such a rule.  *See, e.g.*, *Ocasio v. Ashcroft*, 375 F.3d 105, 107
(1st Cir. 2004); *Olabanji v. INS*, 973 F.2d 1232, 1234 (5th Cir. 1992); *see also Dallo v. INS*, 765
F.2d 581, 586 (6th Cir. 1985) (distinguishing a case that did apply this rule without commenting
upon the rule's vitality in the Sixth Circuit).

Additionally, the Seventh Circuit has hinted that it might accept a version of this rule sans
the "reasonable efforts" exception.  *Pouhova v. Holder*, 726 F.3d 1007, 1015 (7th Cir. 2013).  In
that case, the government asked the Seventh Circuit to hold that unreliable hearsay statements
may be admitted so long as the government "has made reasonable but unsuccessful efforts to
locate the witness."  *Id.*  The court, however, rejected this invitation.  It noted that it need not
resolve the issue either way because "the government failed to make such reasonable efforts."
*Id.*  Finally, it added that "[w]e do not see why making an unsuccessful effort to locate a witness
renders the unreliable hearsay evidence any more reliable or its use any fairer than without such
effort."  *Id.*

We need not ponder the sagacity of taking this approach because Indrawati cannot
establish the requisite substantial prejudice.

[24] The IJ noted this in his oral decision, stating:

[T]he Court finds that [Rodez's] testimony as to making the checkmarks during
the interview with his notes is credible and believable.  Therefore, the Court finds

29

evidence alone could have satisfied the Government's burden to prove by a preponderance of the evidence that Indrawati submitted a frivolous asylum application. The BIA held that the IJ's decision to credit Rodez's testimony (and discredit Indrawati's testimony) was not clearly erroneous. Even if we believed that the IJ and the BIA were incorrect, we cannot say that the "record compels a reversal." *Tan*, 446 F.3d at 1374 (quotation marks omitted). Accordingly, even if reliance upon the FVM violated Indrawati's right to due process, Indrawati cannot demonstrate substantial prejudice given the finding that Rodez was credible and that he made the checkmarks during the interview.

Indeed, the cases Indrawati cites for support serve only to highlight her claim's deficiencies. In one line of cases, the hearsay whose admission violated due process constituted the only evidence supporting removal. *See Hassan v. Holder*, 604 F.3d 915, 927 (6th Cir. 2010); *Alexandrov v. Gonzalez*, 442 F.3d 395, 407 (6th Cir. 2006). In another line of cases, the hearsay, though not the only evidence supporting removal, was dispositive. *See Banat*, 557 F.3d at 893 (finding

that these specific items were asked and that [Indrawati] gave fabricated answers . . . .

The BIA alluded to the same:

[T]he [IJ] credited the testimony of Asylum Officer Rodez that he interviewed the respondent based on this statement, and placed checkmarks on the document to verify that she testified consistently with its contents.

(citations omitted).

that the IJ's credibility determination relied primarily upon a letter containing multiple levels of hearsay); *Anim*, 535 F.3d at 258 (finding a due process violation where the IJ's determination that the petitioner submitted fraudulent documents could be sustained only after relying on a letter comprised of multiple levels of hearsay); *Ezeagwuna v. Ashcroft*, 325 F.3d 396, 408 (3d Cir. 2003) (finding a due process violation where the BIA based its credibility finding "almost entirely upon" a document containing multiple levels of hearsay).  In these cases, substantial prejudice was manifest.  Indrawati's case is clearly distinguishable. Accordingly, we conclude that Indrawati's due process claim relating to the FVM does not justify granting her petition.  *See Cole v. Att'y Gen.*, 712 F.3d 517, 535 (11th Cir. 2013).

## V.

Indrawati's diverse arguments clothed in "reasoned consideration" garb fare no better than her arguments based on due process.  Occasionally, this court has granted petitions for review, vacated agency decisions, and remanded for further proceedings when the agency's decision was so lacking in reasoned consideration and explanation that meaningful review was impossible.  *See, e.g.*, *Mezvrishvili v. U.S. Att'y Gen.*, 467 F.3d 1292, 1297 (11th Cir. 2006) (per curiam).  When assessing whether a decision displays reasoned consideration, we look only to ensure that the IJ and the BIA considered the issues raised and announced their

31

decisions in terms sufficient to enable review. *Cole v. U.S. Att'y Gen.*, 712 F.3d 517, 534 (11th Cir. 2013).

Although it is true that the IJ and the BIA must consider all the evidence submitted, "it is well established that the IJ and the BIA need not address specifically each claim the petitioner made or each piece of evidence the petitioner presented." *Id.* (quotation marks omitted). Accordingly, a decision that omits the discussion of certain pieces of evidence can nonetheless display reasoned consideration. Furthermore, our reasoned-consideration examination "does not amount to a review for whether sufficient evidence supports the decision of the [BIA]." *Perez-Guerrero v. U.S. Att'y Gen.*, 717 F.3d 1224, 1232 (11th Cir. 2013). That is to say, when we remand for lack of reasoned consideration, it is not because we have reviewed the BIA's decision and disagreed with its legal conclusions and factual findings. *See Mezvrishvili*, 467 F.3d at 1297. Rather, we have determined that, *given the facts and claims in the specific case before the IJ and the BIA*, the agency decision is so fundamentally incomplete that a review of legal and factual determinations would be quixotic. *See id.* Our inquiry concerns process, not substance; we look to see that the agency "heard and thought and not merely reacted." *Cole*, 712 F.3d at 534 (quotation marks omitted).

For example, in *Tan v. United States Attorney General*, 446 F.3d 1369 (11th Cir. 2006), Liana Tan, a native of Indonesia and an ethnically Chinese Christian,

32

applied for withholding of removal based in part upon a well-founded fear of future persecution predicated upon her race. 446 F.3d at 1370–71. The IJ rejected her application, and the BIA affirmed that decision without opinion. *Id.* at 1373. Tan had supported her claim with Country Reports and newspaper articles attesting to widespread violence against Chinese people and Christians. *Id.* at 1375. Her application for withholding of removal also noted that her family's business had recently been looted and damaged during a riot. *Id.* at 1376. Nonetheless, the IJ failed to mention the reports and articles when cataloguing the evidence in Tan's case and also misstated the facts, declaring that Tan's family continued to live in Indonesia without problems. *Id.* at 1375–76. The IJ supported his decision to reject her application for withholding of removal based upon a well-founded fear of future persecution because "a great deal of [Indonesia's Christian population of 20 million] are ethnic Chinese," and that "[t]herefore, based on the evidence that I have, I don't believe she would be singled out simply because she is Christian and of ethnic Chinese origin." *Id.* at 1373.

We held that this constituted a lack of reasoned consideration. However, we did not do so simply because the IJ failed to discuss all of the evidence. *See id.* at 1375. Rather, we held that the IJ's decision was defective because his statements were so patently unsupported (and contradicted) by the record, that "they undermine[d] the conclusion that [he] considered all the evidence." *Id.* at 1376.

33

Tan had raised evidence supporting her claim for withholding of removal, and the IJ's decision gave us the impression not that he considered and assigned little weight to her evidence, but rather that the evidence did not enter his calculus whatsoever.  Reading the application left us with the firm conviction that the IJ had "merely reacted" to Tan's application.  *See Cole*, 712 F.3d at 534.  Having abdicated his role as principled arbiter, the IJ's "decision" was nothing of the sort, rendering nonsensical any attempt to seriously review its legal and factual determinations.

## A.

Indrawati's various arguments do not undermine our conclusion that the BIA's decision reflects reasoned consideration.  To begin, Indrawati's arguments concerning discrepancies in Officer Rodez's statement, equivocation in his testimony, and the quality of his note-taking are misguided.  Indrawati argues that the IJ and the BIA failed to consider that Rodez's notes indicate that Indrawati never sought medical attention, despite the fact that the Statement clearly recounts that she was hospitalized following the Surabaya assault.  However, Indrawati never elicited these inconsistencies during the hearing with the IJ and did not bring them to the BIA's attention.  We have said that the BIA need consider only the issues raised.  *Cole*, 712 F.3d at 534.  Because Indrawati raises this issue for the first time in her petition to this court, the IJ and the BIA had no reason to consider

34

that argument. Their failure to divine and discuss any possible arguments Indrawati might make at a future point does not reflect a lack of reasoned consideration. The same is true of her argument that reliance upon notes that purportedly do not meet BIA requirements reflects a lack of reasoned consideration. Because Indrawati never made these arguments before the BIA, it is reasonable that the BIA explicitly considered neither.

### B.

Indrawati also quarrels with the BIA's use of Officer Conwell's testimony to support its decision. Indrawati argues that Conwell's testimony actually bolsters her innocence. The theory goes that, because Conwell stated that she thought Indrawati was honest during her termination interview, and because Indrawati told Conwell that Indrawati had never seen her own application and answered all of Rodez's statements truthfully, Conwell must have believed Indrawati's account of the interview. According to Indrawati, if Conwell believed Indrawati's narrative, it is more likely that Indrawati testified truthfully to Rodez; Indrawati is therefore innocent. That the BIA did not reach this conclusion—indeed, that it reached the *opposite* conclusion—should convince us that the BIA's decision reflects a lack of reasoned consideration.

We disagree. True, the BIA did not discuss Conwell's belief that Indrawati was truthful. However, we think this omission proper given that Conwell's

perceptions are irrelevant to the frivolousness determination.  At its core, that determination hinges upon whether Rodez asked Indrawati about the Statement during her asylum interview.  Conwell's opinion as to Indrawati's veracity tells us nothing about the asylum interview.  It shows only that, *without regard to whether what she was saying was true*, Indrawati was a persuasive interviewee.[25]  If anything, the BIA's omission here was merciful.  Conwell's opinion supports the Government's theory that Indrawati was capable of testifying falsely without detection.

Furthermore, Conwell's testimony was not so critical to this case that the BIA's failure to wrestle with its implications undermines our confidence that the BIA performed its duty and rendered a reasoned decision.  Conwell's testimony demonstrated only that Indrawati had previously admitted that her application was fraudulent.  The evidence merely corroborated an undisputed fact.  If an agency need not discuss every piece of evidence to immunize its decision from a reasonable-consideration inquiry, surely its failure to exhaustively discuss evidence of little probative value does not merit remand.

---

[25] Another theory for considering Conwell's opinion would be that it was reputation evidence of Indrawati's character for truthfulness.  However, Conwell's solitary interaction with Indrawati was woefully inadequate as a foundation for such testimony.  *Cf.* Fed. R. Evid. 602. Furthermore, it patently was not reputation evidence, but instead referred to a specific interaction.

C.

Indrawati also argues that the BIA's decision reflected a lack of reasoned consideration because the BIA improperly speculated that Rodez "would only rely on material he covered with an asylum applicant during an interview in drafting his assessment whether to grant asylum." Indrawati considers this speculation because Rodez's report refers to Indrawati's hospitalization. Although the check-marked Statement refers to Indrawati's hospitalization, Rodez's handwritten notes reflect that Indrawati was not hospitalized. Neither party disputes that Rodez took these handwritten notes during the interview. Because those notes reflect that Indrawati was not hospitalized, the theory apparently goes, it necessarily means that Indrawati never testified to the contrary. And if the report states that Indrawati *was* hospitalized, it must mean that Rodez relied upon material not covered during the interview: the Statement.

Central to this chain of reasoning is an assumption that Rodez did not annotate the Statement with checkmarks during the interview. Of course, the IJ made a finding of fact to the contrary, and the BIA found no error in that finding. Indrawati's argument that the BIA's decision reflects a lack of reasoned consideration because the decision includes speculation is simply incoherent unless we are to first reverse the IJ's factual findings.

37

Perhaps this is why Indrawati supports her "reasoned consideration" argument with citations to two cases where we reversed findings of fact unsupported by substantial evidence. *See Xiu Ying Wu v. U.S. Att'y Gen.*, 712 F.3d 486, 494 (11th Cir. 2013); *Tang v. U.S. Att'y Gen.*, 578 F.3d 1270, 1278 (11th Cir. 2009). To reiterate, we review administrative findings of fact under the substantial-evidence test, and will reverse such findings "only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings." *See Seck v. U.S. Att'y Gen.*, 663 F.3d 1356, 1364 (11th Cir. 2011) (quotation marks omitted). In both *Xiu Ying Wu* and *Tang*, the IJ made an adverse credibility determination based upon speculation, rather than evidence. *Xiu Ying Wu*, 712 F.3d at 494 (noting that "[n]either the BIA nor the IJ cited to any record evidence to support their conclusion that Wu's story was implausible"); *Tang*, 578 F.3d at 1278 (noting that the IJ "based his adverse credibility determination on his personal perceptions about the reasonableness of Tang's mother's actions," and that no evidence supported his determination).

Cases discussing our review of administrative findings of fact under the substantial-evidence test are inapplicable to the question of whether the BIA's decision exhibits reasoned consideration. To the extent that her reasoned consideration argument actually is a challenge to administrative fact-finding, we

38

agree with the BIA that the IJ did not err when deciding to credit Rodez's testimony. Although Rodez's contradictory notes may raise an eyebrow, when viewed in combination with all the other evidence, this inconsistency does not compel us to reverse the factual findings. Accordingly, we decline to grant Indrawati's petition based upon this argument.

### D.

Finally, Indrawati argues that the BIA's "reliance on documentary evidence lacking basic indicia of reliability reflects a lack of reasoned consideration." Indrawati cites no cases to support this legal theory. Moreover, this conclusory argument is simply a repackaged version of her argument that reliance upon these documents violated her right to due process. As we noted above, admission and reliance upon these documents was proper (or uncontested, in the case of the TSCM). Reliance upon properly admitted evidence is precisely what we would hope the BIA does when rendering decisions. Indeed, it is when the BIA *disregards* properly admitted evidence that its decisions reflect a lack of reasoned consideration. *See Tan*, 446 F.3d at 1375–76. Accordingly, we find this argument meritless.

### VI.

For the foregoing reasons, we DISMISS in part and DENY in part Indrawati's petition for review.

DISMISSED, in part; DENIED, in part.