[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-11130

_____

Agency No. A206-733-433

GEISEL GEOBANY ZAPATA-MATUTE,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(August 28, 2019)

Before MARTIN, ROSENBAUM, Circuit Judges, and MARTINEZ,[*] District
Judge.

MARTIN, Circuit Judge:

---

[*] Honorable Jose E. Martinez, United States District Judge for the Southern District of
Florida, sitting by designation.

Geisel Zapata-Matute petitions for review of the Board of Immigration Appeals' ("BIA") decision denying him asylum, withholding of removal, and withholding of removal under the Convention Against Torture ("CAT"). After careful consideration and with the benefit of oral argument, we grant the petition in part, dismiss in part, deny in part, and remand his CAT claim for further consideration by the agency.

## I.

Mr. Zapata-Matute is a nineteen-year-old native and citizen of Honduras. When he was two years old, his father left Honduras for the United States. His mother followed suit two years later, entrusting Mr. Zapata-Matute to the care of his grandparents and uncles. Mr. Zapata-Matute's grandparents ensured he regularly attended school and helped out with the family farm. From time to time, Mr. Zapata-Matute's parents would send money back to Honduras to help pay for his studies, clothing, and other needs.

Mr. Zapata-Matute had twelve uncles, who also lived on the family farm with him. He was particularly close to his uncle, Henry Gerardo, who had been a member of the Maras, a word for Honduras's gangs. At some point in the past, Mr. Gerardo came to want no further involvement with the Maras and broke away from it. This angered the Maras, who threatened to kill everyone in the family if Mr. Gerardo didn't turn himself in. Mr. Gerardo went into hiding and the other

2

uncles began sleeping outside the house, armed with guns, to protect the family. Mr. Zapata-Matute's father became concerned for his son's safety and arranged for a "coyote" to bring Zapata-Matute across the border and into the United States so he could rejoin his parents.

Mr. Zapata-Matute arrived in the United States on May 3, 2014—two weeks after his fourteenth birthday. The Department of Homeland Security ("DHS") swiftly initiated removal proceedings against him for entering the country without admission or parole. DHS also detained Mr. Zapata-Matute in Texas, eventually releasing him into his mother's custody in Green Cove Springs, Florida.

While removal proceedings remained pending against Mr. Zapata-Matute, he received word from his grandmother back in Honduras that Mr. Gerardo had been murdered. As it turns out, Mr. Gerardo, like Mr. Zapata-Matute, had fled to the United States for safety. However, shortly after this country deported him back to Honduras, the Maras found Mr. Gerardo and gunned him down in broad daylight. The same gang also shot and injured one of Mr. Zapata-Matute's cousins, who was with Mr. Gerardo on the day he was killed.

Because Mr. Zapata-Matute was an unaccompanied minor, he was able to file an application for asylum with the United States Citizenship and Immigration Services ("USCIS") on August 24, 2015. This filing had the effect of closing his removal proceedings before the immigration judge ("IJ"). DHS reopened removal

proceedings on August 8, 2016 after USCIS denied the application, and Mr. Zapata-Matute's removal hearing took place on May 16, 2017.

At the hearing, counsel for Mr. Zapata-Matute agreed with the IJ's characterization of Zapata-Matute's particular social group ("PSG") as "young men without family, who are afraid of being recruited by the gangs." Counsel did not ask Mr. Zapata-Matute whether he had been trafficked while crossing the border, even though the IJ specifically instructed him to do so. Mr. Zapata-Matute, for his part, testified that he was "afraid" to go back because it was "very dangerous."

In addition to Mr. Zapata-Matute's testimony, the record before the IJ included an affidavit from his grandmother expressing her fear that Mr. Zapata-Matute would be killed by the same gang members who killed Mr. Gerardo. The record also included evidence that "[m]urders of children ages 17 and under [in Honduras] grew more than 77 percent during 2014," and that "[b]etween five and ten migrant children [were] killed . . . after the United States deported them back to Honduras."

At the conclusion of the removal hearing, the IJ expressed concern about whether Mr. Zapata-Matute could show he was persecuted on account of a PSG cognizable under the Immigration and Nationality Act ("INA"). The IJ gave counsel for Mr. Zapata-Matute one more opportunity to clearly articulate a PSG.

4

Counsel did not, electing instead to characterize Mr. Zapata-Matute as an abandoned child whose abandonment contributed to his persecution.

Unsurprisingly, the IJ did not find this argument persuasive. Thus, the IJ denied Mr. Zapata-Matute's applications for asylum, withholding, and CAT relief. The IJ found Mr. Zapata-Matute credible but ineligible for relief because his proposed PSG of "young men and women [in Honduras] who may be subjected to recruitment efforts by the gangs and who may reject or resist membership in such gangs" was not cognizable under the BIA's past precedent. As for Mr. Zapata-Matute's CAT claim, the IJ found no evidence suggesting there were "gross, flagrant, or mass violations of human rights by the government [in Honduras]." Although the IJ expressed sympathy for Mr. Zapata-Matute's difficult situation, he ultimately ordered Zapata-Matute removed to Honduras.

Mr. Zapata-Matute appealed the IJ's decision to the BIA, which affirmed the removal order. The BIA declined to "disturb the [IJ's] determination that [Mr. Zapata-Matute] did not establish persecution on account of membership in a particular social group." The BIA also affirmed the IJ's denial of CAT relief because it agreed "the totality of the record evidence did not establish that it is more likely than not that [Mr. Zapata-Matute] will be tortured by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity in Honduras."

5

Mr. Zapata-Matute timely petitioned this Court for review.[1]

## II.

We review "claims of legal error, . . . including claims that the BIA did not provide reasoned consideration of its decision, de novo." Bing Quan Lin v. U.S. Att'y Gen., 881 F.3d 860, 872 (11th Cir. 2018). We likewise review de novo whether "an asserted group qualifies as a 'particular social group' under the INA," Gonzales v. U.S. Att'y Gen., 820 F.3d 399, 403 (11th Cir. 2016) (per curiam), as well as whether we have jurisdiction to consider a claim raised by the petitioner in his petition for review, see Amaya-Artunduaga v. U.S. Att'y Gen., 463 F.3d 1247, 1250 (11th Cir. 2006) (per curiam). We review factual determinations by the agency for substantial evidence, meaning we cannot reverse the agency's decision unless "the evidence compels a reasonable fact finder to find otherwise." Chen v. U.S. Att'y Gen., 463 F.3d 1228, 1230–31 (11th Cir. 2006) (per curiam) (quotation marks omitted).

## III.

Mr. Zapata-Matute first argues the BIA and the IJ failed to give reasoned consideration to his asylum and withholding of removal claims. The government

---

[1] Mr. Zapata-Matute filed his petition for review pro se. This Court appointed Mark Gruetzmacher, Jr. to serve as his attorney on appeal. Appointed counsel has admirably discharged his responsibilities and performed a service both to Mr. Zapata-Matute and this Court.

argues in response that this Court need not address this argument because Mr. Zapata-Matute failed to present a cognizable PSG, which is dispositive of his asylum and withholding applications.  The government has the better argument.

In order to be eligible for asylum or withholding of removal, a petitioner must prove he has a well-founded fear of future persecution.  See 8 C.F.R. §§ 1208.13(b), 1208.16(b).  This includes proving that he "has a fear of persecution in [his] . . . country of nationality . . . on account of race, religion, membership in a particular social group, or political opinion."  Id. §§ 1208.13(b)(2)(i), 1208.16(b).  Failure to establish persecution on account of any of these categories is fatal to a petitioner's asylum and withholding claims.  See Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1232 n.7 (11th Cir. 2005) (per curiam).

Mr. Zapata-Matute raised only one PSG before the IJ—that of "young men without family [in Honduras], who are afraid of being recruited by the gangs." The IJ, applying binding agency precedent, concluded this PSG was not cognizable under the INA.  See Matter of S-E-G-, 24 I. & N. Dec. 579, 582–84 (BIA 2008). The BIA declined to disturb that determination on appeal.  And in his opening brief before us, Mr. Zapata-Matute concedes that his proposed PSG before the IJ "paralleled the one rejected in Matter of S-E-G-" and is not cognizable under the INA.  This leaves Mr. Zapata-Matute without a PSG that would qualify him for

asylum and withholding of removal.  See 8 C.F.R. §§ 1208.13(b)(2)(i), 1208.16(b).

Even if, as he claims, the BIA and the IJ did not give reasoned consideration to his

asylum and withholding applications, his failure to propose a cognizable PSG to

the agency is dispositive of both applications.  We therefore deny his petition for

review as to this claim.

   Mr. Zapata-Matute nonetheless insists he has proposed a PSG that meets the

INA's requirements because his true PSG consists of "young Hondurans whose

family members' desertion from ultra-violent gangs have caused them to be

marked, targeted, and continuously threatened through no fault of their own."  But

he never raised this PSG or any formulation of it before the agency.  Cf. Cece v.

Holder, 733 F.3d 662, 670 (7th Cir. 2013) (explaining that the inconsistent

descriptions of a noncitizen's PSG did not "upset the claim" because "in one form

or another, both [the noncitizen] and the immigration judge articulated the

parameters of the relevant social group").  And we have no jurisdiction to consider

claims, including newly proposed PSGs, that have not been exhausted before the

agency.  See 8 U.S.C. § 1252(d); see also Granada-Rubio v. Lynch, 814 F.3d 35,

39 (1st Cir. 2016) (per curiam) ("To the extent the social group proposed now was

not proposed to the BIA, it is unexhausted."); Patel v. U.S. Att'y Gen., 559 F.

App'x 817, 821 (11th Cir. 2014) (per curiam) (unpublished) (concluding there was

no jurisdiction "to review the [noncitizens'] claim that they were members of a particular social group" because they "did not raise this claim before the BIA").

We therefore dismiss Mr. Zapata-Matute's petition for review to the extent he argues he is entitled to asylum or withholding of removal based on his newly proposed PSG.[2]

## IV.

Mr. Zapata-Matute separately argues that the BIA and the IJ did not give reasoned consideration to his CAT withholding claim.  Oral Arg. at 6:02–30 (arguing that the IJ did not give reasoned consideration to the country reports and other evidence indicating that the Maras will likely harm Mr. Zapata-Matute if he is removed to Honduras).  We agree.

An agency must "consider all evidence introduced by the applicant." Kazemzadeh v. U.S. Att'y Gen., 577 F.3d 1341, 1351 (11th Cir. 2009) (quotation marks omitted).  Although the agency need not "address specifically . . . each piece of evidence the petitioner presented," the agency must "announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and

---

[2] Our decision does not prevent Mr. Zapata-Matute from filing a motion to reopen, complete with any additional evidence, before the BIA raising this new PSG or alleging ineffective assistance of former counsel.  See 8 C.F.R. § 1003.2(c); Oral Arg. at 14:00–04 (statement of the government that "the recourse that [Mr. Zapata-Matute] has is to pursue a motion to reopen with the Board of Immigration Appeals").  Neither is he precluded from applying for a T- or U-visa if there is evidence that he was trafficked across the border.  Oral Arg. at 16:45–58 (statement of the government that Mr. Zapata-Matute may be eligible for a T- or U-visa if he has evidence that he was trafficked).

thought and not merely reacted." Id. (quotation marks omitted).  An agency fails to give reasoned consideration when it disregards an entire category of properly admitted evidence relevant to a petitioner's claim for relief.  See Indrawati v. U.S. Att'y Gen., 779 F.3d 1284, 1305 (11th Cir. 2015) ("[I]t is when the BIA disregards properly admitted evidence that its decisions reflect a lack of reasoned consideration.").

In this case, the BIA adopted the IJ's decision finding that "the totality of the record evidence did not establish that it is more likely than not that the respondent will be tortured by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity in Honduras."  Because "the BIA explicitly agreed with particular findings of the IJ, we review both the BIA and the IJ's conclusions regarding those issues," Xiu Ying Wu v. U.S. Att'y Gen., 712 F.3d 486, 492 (11th Cir. 2013), to determine whether the agency gave reasoned consideration to Mr. Zapata-Matute's CAT claim.[3]  We conclude it did not.

The IJ found Mr. Zapata-Matute ineligible for CAT relief because there was "no evidence . . . of gross, flagrant, or mass violations of human rights by the government within the country of removal" or evidence that Zapata-Matute would

---

[3] Mr. Zapata-Matute could not have raised "an argument about the lack of reasoned consideration displayed by a [BIA] decision not yet in existence."  Indrawati, 779 F.3d at 1299.  We therefore have jurisdiction over this claim.

10

be unable to "relocate to a part of the country where he is not likely to be tortured." The BIA agreed with those findings in full.  We see two problems with these findings.

First, both agencies appear not to have considered evidence that private parties other than the government have committed gross, flagrant, or mass violations of humans rights in Honduras.  And the regulations do not restrict consideration of flagrant human rights violations to only those committed by the government.  See 8 C.F.R. § 1208.16(c)(3)(iii); see also Pierre v. Gonzales, 502 F.3d 109, 118 (2d Cir. 2007) (explaining "[a] private actor's behavior can constitute torture under the CAT without a government's specific intent to inflict it").  The BIA and IJ therefore failed to consider evidence in the record that the Maras have contributed to Honduras's status as the "world's most dangerous country" and that the Maras have tortured and killed with impunity.  This is evidence the agency was required to consider.  See 8 C.F.R. § 1208.16(c)(iii).

Second, contrary to the IJ and the BIA's findings, there was at least some evidence that Mr. Zapata-Matute would be unable to safely relocate to a different part of Honduras.  He specifically testified that the gangs "are everywhere" in Honduras and that although he had a few family members who did not live with his grandparents in Honduras, it would be "very dangerous" to go live with them. Because the IJ found Mr. Zapata-Matute credible, both the IJ and the BIA were

11

required to credit that testimony.  See Tan v. U.S. Att'y Gen., 446 F.3d 1369, 1376 (11th Cir. 2006).  The IJ's statement that there was "no evidence" Mr. Zapata-Matute would be unable to safely relocate within Honduras was "unsupported by the record."  Id.  Beyond that, the BIA's decision to adopt that unsupported finding "undermine[s] the conclusion that the [agency] considered all the evidence."  Id.  We therefore grant Mr. Zapata-Matute's petition for review and remand his CAT claim for reconsideration.

**PETITION FOR REVIEW GRANTED IN PART, DISMISSED IN PART, DENIED IN PART, AND REMANDED.**