[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 19-13865
Non-Argument Calendar
_____

Agency No. A088-150-956

BAKHODIR SABITOVICH MADJITOV,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

(September 14, 2020)

Before JILL PRYOR, BRANCH, and LAGOA, Circuit Judges.

PER CURIAM:

Bakhodir Madjitov seeks review of an order of the Board of Immigration Appeals ("BIA") denying his motion to reopen removal proceedings as untimely, pursuant to Immigration and Nationality Act ("INA") §240(c)(7)(C)(i), 8 U.S.C. § 1229a(c)(7)(C)(i).  The BIA concluded that Madjitov failed to establish any exception to the filing deadline because he had not shown that country conditions in Uzbekistan materially changed since his merits hearing in 2013.  It also concluded that he had not shown that he was *prima facie* eligible for asylum under INA § 208(a), 8 U.S.C. § 1158(a), withholding of removal under INA § 241(b)(3), 8 U.S.C. § 1231(b)(3), or withholding of removal under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), 8 C.F.R. § 208.16(c).  Madjitov argues on appeal that the BIA incorrectly decided these questions because the evidence he submitted demonstrated both a *prima facie* case for asylum, withholding of removal, and CAT relief, and also that his evidence demonstrates material changed country conditions.  After review, we affirm of the BIA, and dismiss in part and deny in part the petition for review.

## I.    Background

Madjitov, a native and citizen of Uzbekistan, entered the United States in March 2006 on a temporary visa.  After his visa expired, he filed an application for asylum, withholding of removal, and CAT protection on January 3, 2007, alleging

2

that he was persecuted on the basis of political opinion and membership in a particular social group. He stated that he had been arrested, detained, and beaten by the police in May 2005 for participating in a peace demonstration, and threatened and attacked in June 2005 for believing in democracy, and he feared he would be arrested and harmed by the police if he was returned to Uzbekistan.

In January 2007, the Department of Homeland Security ("DHS") served Madjitov with a notice to appear, which charged that he was removable for overstaying his visa, pursuant to INA § 237(a)(1)(B), 8 U.S.C. § 1227(a)(1)(B). Madjitov conceded removability as charged, indicated that he wished to apply for asylum, withholding of removal, and CAT relief, and submitted a supplement to his application for relief. The immigration judge ("IJ") ultimately denied his applications in May 2013 after finding he was not credible and that he failed to provide sufficient corroborating evidence.[1] In July and October of 2014, the BIA dismissed Madjitov's appeal and denied his motion for reconsideration. Madjitov did not seek judicial review.

In January 2018, Madjitov, through counsel, filed a motion asking the BIA to reopen proceedings *sua sponte* in order to allow him to adjust his status to that of lawful permanent resident based on hardship to his family. Madjitov submitted

---

[1] The original decision of the IJ was issued in 2011 but was missing a portion of the IJ's reasoning. The IJ reissued a full decision upon remand from the BIA.

3

documents to the agency during his proceedings indicating that he married his wife, Madina Mamadjonova, in July 2012; she later became a U.S. citizen in April 2015; and they resided with their children in Connecticut. Madjitov also submitted documents indicating that U.S. Citizenship and Immigration Services ("USCIS") had approved an I-130 petition for alien relative in 2013 filed by Madjitov's wife on his behalf. In October 2016, Madjitov filed an I-485 application to adjust his status to that of legal permanent resident. He was detained on December 22, 2017 and moved to the Etowah County Detention Center in Alabama.

Soon after, in March 2018, Madjitov retained new counsel and submitted an amended motion to reopen based on changed conditions in Uzbekistan, along with a motion for a stay of removal. He argued that increased surveillance in Uzbekistan and its practice of persecuting family members of suspected terrorists, coupled with the public investigation into one of his brothers-in-law's affiliation with an ISIS affiliate, warranted reopening. In support of his amended motion, Madjitov submitted a new asylum application based on religion, political opinion, and membership in a particular social group; a December 2017 Department of Justice press release about the arrest of his brother-in-law for lying about knowledge of his brother who was a member of a group affiliated with ISIS; 2015 and 2017 reports by Amnesty International ("Amnesty reports") documenting use of surveillance and torture by the Uzbekistani government; and the U.S. State

Department's 2016 Human Rights Report for Uzbekistan ("Country Report"). The Department of Justice press release indicated that, on the same day Madjitov was detained by immigration authorities, federal authorities arrested his brother-in-law, Sidikjon Mamadjonov, and charged him with unlawful procurement of naturalization by lying about his sibling's connection with an ISIS affiliate.

In May 2018, the BIA denied Madjitov's January 2018 motion to reopen for family hardships as untimely because he failed to establish any exception to the filing deadline and, it concluded, becoming eligible for legal permanent resident status was not an extraordinary reason to reopen his filing deadline. The BIA did not address Madjitov's March 2018 amended motion.

On May 30, 2018, Madjitov, through counsel, again moved the BIA to reopen his proceedings based on changed country conditions in Uzbekistan, using the same unaddressed claims and evidence from his amended motion to reopen in March 2018.[2]

In September 2019, the BIA denied Madjitov's May 2018 motion to reopen.[3] The BIA concluded that Madjitov had not demonstrated materially

---

[2] In June 2019, Madjitov also filed a *pro se* supplement to the motion, arguing that the Third Circuit had published relevant intervening precedent and that he feared persecution based on his Salafi Muslim faith, which he described as a "strict" form of Islam, and the Uzbekistani government incorrectly associated these religious beliefs with terrorism.

[3] As an initial matter, the BIA stated that it would not treat Madjitov's motion to reopen as number-barred, as it was "unclear what happened [to] the March 6, 2018, filing" submitted to the BIA as an amendment to his first motion to reopen.

changed country conditions or circumstances since the time of his 2013 merits hearing. First, it stated, "[t]he background evidence indicates that for the past 15 years, the Uzbekistan government has been 'clamping down' on suspected members and sympathizers of Islamic groups, and targeting entire families." As such, it reasoned, Madjitov had not shown changed country conditions since 2013 "with respect to Uzbekistan government's treatment of Islamic terrorists or other religious extremists." The BIA concluded that Uzbekistan's increased online surveillance of citizens at home and abroad was not a changed country condition or circumstance "material to his claim." It reasoned, "[g]iven changes in technology and surveillance, as well as world-wide concerns with terrorist attacks, such efforts at law enforcement are not the type of change contemplated by the statute or regulations, as it [sic] does not signify an increase in government-based persecution on account of a protected ground."

Third, it stated that Madjitov had not shown he was *prima facie* eligible for relief because he had not submitted any evidence that he would be personally targeted if returned to Uzbekistan, as he had not submitted any evidence that his relatives or his wife's relatives had been harmed as a result of the activities of his wife's deceased brother.

Finally, the BIA declined to grant his motion to reopen based on his supplemental filing because he did not submit a new asylum application based on

6

the claim, and because his translated evidence was not certified. It also concluded that his motion did not demonstrate an exceptional situation that would warrant the exercise of its discretion to reopen proceedings under its *sua sponte* authority.[4] This petition for review followed.

## II.    Standard of Review

We review the BIA's denial of a motion to reopen removal proceedings for abuse of discretion, which is limited to determining whether the BIA exercised its discretion in an arbitrary or capricious manner. *Zhang v. U.S. Att'y Gen.*, 572 F.3d 1316, 1319 (11th Cir. 2009). Where a petitioner challenges the BIA's nondiscretionary grounds for denying a motion to reopen, we remand only if the BIA has not given "reasoned consideration" of a question or made "adequate findings." *Bing Quan Lin v. U.S. Att'y Gen.*, 881 F.3d 860, 874 (11th Cir. 2018). The BIA must consider the issues raised and announce its decision in terms sufficient to enable a reviewing court to "perceive that it has heard and thought and not merely reacted." *Jeune v. U.S. Att'y Gen.*, 810 F.3d 792, 803 (11th Cir. 2016) (quotation marks omitted). The immigration judge's factual findings are considered "conclusive unless a reasonable factfinder would be compelled to

---

[4] In November 2019, Madjitov filed a 28 U.S.C. § 2241 petition for habeas relief in the U.S. District Court for the District of Connecticut, arguing that he had a constitutional due process right to complete a "provisional unlawful presence waiver of inadmissibility," pursuant to 8 C.F.R. § 212.7(e), which the district court dismissed for lack of jurisdiction.

7

conclude to the contrary." *Lonyem v. U.S. Att'y Gen.*, 352 F.3d 1338, 1340 (11th Cir. 2003).

We determine our own subject matter jurisdiction *de novo*. *Guzman-Munoz v. U.S. Att'y Gen.*, 733 F.3d 1311, 1313 (11th Cir. 2013).

### III.    Discussion

### A. Madjitov Did Not Demonstrate a Material Change in Country Conditions

Generally, an alien must file a motion to reopen his removal proceedings within 90 days of the date of entry of a final administrative order of removal, subject to certain exceptions. *Zhang*, 572 F.3d at 1319; INA § 240(c)(7)(C)(1), 8 U.S.C. § 1229a(c)(7)(C)(i); 8 C.F.R. § 1003.2(c)(2). As relevant here, the INA provides for an exception to the time limitation if the motion to reopen is "based on changed circumstances arising in the country of nationality or the country to which removal has been ordered, if such evidence is material and was not available and would not have been discovered or presented at the previous proceeding." INA § 240(c)(7)(C)(ii), 8 U.S.C. § 1229a(c)(7)(C)(ii); *Jiang v. U.S. Att'y Gen.*, 568 F.3d 1252, 1256 (11th Cir. 2009). That motion "shall state the *new facts* that will be proven at a hearing to be held if the motion is granted, and shall be supported by affidavits or other evidentiary material." INA § 240(c)(7)(B), 8 U.S.C. § 1229a(c)(7)(B) (emphasis added). An alien seeking to show that evidence is material bears a heavy burden, and must present evidence demonstrating that, if

8

proceedings were reopened, the new evidence would likely change the result. *Jiang*, 568 F.3d at 1256–57.  The moving party bears a heavy burden because motions to reopen are disfavored, particularly in removal proceedings, where delays works to the advantage of the deportable noncitizen.  *Zhang*, 572 F.3d at 1319; *see also Gbaya v. U.S. Att'y Gen.*, 342 F.3d 1219, 1220 (11th Cir. 2003) (stating that "in this particular area, the BIA's discretion is quite broad").  A change in personal circumstances does not authorize the untimely filing of a motion to reopen.  *Id.* at 1258.

Here, we affirm the BIA's determination that Madjitov did not prove a material change in country conditions.[5]  The changed circumstances exception applies only "when (1) an alien files a motion to reopen that seeks asylum, withholding of removal, or relief under the Convention Against Torture; (2) the motion is predicated on changed country conditions; and (3) the changed conditions are material and could not have been discovered at the time of the removal."  *Jiang*, 568 F.3d at 1256.  We address the supporting documents filed by Madjitov in turn to explain how they do not compel a reversal.

### 1. *Madjitov's Family and Changed Personal Circumstance*

---

[5] We decline to address Madjitov's argument that he established a *prima facie* case for any form of relief because we can resolve the appeal on an alternative ground upon which the BIA relied.  *See Malu v. U.S. Att'y Gen.*, 764 F.3d 1282, 1290–91 (11th Cir. 2014); *Najjar v. Ashcroft*, 257 F.3d 1262, 1302 (11th Cir. 2001).

A change in personal circumstance alone cannot equate a changed country circumstance. *Zhang*, 572 F.3d at 1319. Madjitov admits as much in his briefing by arguing that his changed personal circumstances are relevant *because* of changed country conditions. Thus, we do not find the documents Madjitov submitted relating to his family history sufficient to compel the BIA to reopen his case. Rather, we must determine what the documents submitted regarding the country of Uzbekistan show.

    2. *The 2017 and 2015 Amnesty Reports*

Madjitov argues that the two Amnesty Reports he submitted documented an increase in persecution and torture of family members of suspected terrorists as well as an increased ability of the government to carry out its repressive practices due to an enhanced surveillance program. Upon review, we cannot conclude that the BIA clearly erred in finding these articles did not show a material change in country conditions. It is true that the 2015 report stated that "Uzbekistani authorities routinely target relatives of detainees or prisoners charged with or convicted of anti-state offences" and families of those suspected of membership in banned Islamic movements or groups, in order to pressure them to disclose the suspect's whereabouts or pressure them to surrender themselves. But a fair reading of the report indicates that this practice has been going on as early as 1999, when the president endorsed punishment of relatives of "Islamist fundamentalists" after a

10

bombing. In fact, the report contains numerous indications that the torture of suspected terrorists and their family members is not a changed country condition, such as:

(1) describing itself as providing "updates on key cases and human rights concerns since 1992,"

(2) documenting certain torture techniques currently being used which have continued "since 1992,"

(3) containing accounts of unjustified detention and torture of terrorist suspects and their family members from 1999, 2007, 2008, and 2011

(4) attributing the increase of torture on suspected terrorists and their family members to the international "war on terrorism" that was started in 2001

(5) reporting that the torture of terrorism suspects had been ongoing "[o]ver the last 15 years" as the government "responded to a number of violent events by clamping down on suspected members and sympathizers of banned secular and Islamist opposition parties and Islamic movements," and

(6) stating that "[n]ational security has been at the top of the Uzbekistani government's agenda for the past two decades."

In short, the report indicates a *continuation* of the bad acts Madjitov fears rather than a *change* in country conditions. The only "change" documented in the report

11

is the passage of a new law on prevention of crimes which became effective in August of 2014 that mandated lists of offenders and individuals believed to be at risk of committing crimes be kept by local neighborhood committees and security forces, including "members or suspected members of banned Islamist groups and Islamic movements and their families."  But keeping a list of suspects is not the same as implementing a new policy of torture, and so the report does not compel a finding that the BIA erred.

As to the 2017 Amnesty report, we have doubts whether it demonstrates a change in country conditions, since the new surveillance technology it chronicles were merely tactics which "help[] reinforce the already repressive environment."  But assuming *arguendo* that this new technology is a "changed country condition," it is not a material change.  The article describes the new ability of the Uzbekistani government to hack a device with malware and access all the device's content, intercept communications, track the device's location, and remotely activate the device's microphone and camera.  We do not see how this new approach is material to Madjitov, who claims that he will be targeted because of a public news release about his brother-in-law rather than any private communications he has had.  Further, the report does not conclusively demonstrate that the Uzbekistani government has misused this newfound ability, rather that people voluntarily ceased communications in fear that it would be.

12

*3. The 2016 Department of Justice Country Report*

The 2016 country report does not paint Uzbekistan in a favorable light. According to the report, law enforcement officers routinely use torture, including threats against family members, to obtain confessions or incriminating information from detainees.  And in 2016, authorities reportedly increased the severity of punishments for individuals suspected of "Islamist extremism."  Specific credible cases of torture or mistreatment were documented against six men accused of participating in banned religious organizations and three human rights activists or whistleblowers, and there were credible cases of harassment of family members of five human rights activists.  However, nothing in the report indicates that the arrest, threats, or torture against family members of suspected terrorists is a new development.  Indeed, some of these cases cited in the report began in 1999, 2003, and 2010.  Notably, a 2010 Country Report submitted earlier in the proceedings also reported that family members of suspected terrorists were targeted for mistreatment by security forces in Uzbekistan.  Thus, the 2016 country report does not signify the BIA clearly erred in finding no material changed country condition that would justify reopening a removal proceeding.

B. We Lack Jurisdiction to Consider Madjitov's Suspension Clause Argument

We lack jurisdiction to review the BIA's decision unless the petitioner has exhausted all administrative remedies available to him.  *Indrawati v. U.S. Att'y*

13

*Gen.*, 779 F.3d 1284, 1297 (11th Cir. 2015).  A petitioner fails to exhaust all administrative remedies regarding a specific claim when he neglects to raise that claim before the BIA.  *Id.*  This requirement is not "stringent."  *Id.*  It merely requires the petitioner to have argued previously the "core issue" now on appeal before the BIA, as well as to have set out any discrete arguments supporting the claim.  *Jeune*, 810 F.3d at 800 (quotation marks omitted).  The exhaustion requirement is jurisdictional and precludes review of a claim that was not presented to the BIA.  *Amaya-Artunduaga v. U.S. Att'y Gen.*, 463 F.3d 1247, 1249–50 (11th Cir. 2006).  Where a procedural due process claim properly falls within the immigration courts' power to review and provide a remedy, the claim must be exhausted before we can consider it.  *Id.* at 1251.

Madjitov argues that he brought a habeas claim in the U.S. District Court for the District of Connecticut seeking an injunction to allow him to remain in the United States in order to apply for a provisional unlawful presence waiver of inadmissibility, pursuant to 8 C.F.R. § 212.7(e).  He argues that his "habeas" claim must be heard in some forum in order to avoid violating the Suspension Clause, and that this Court should grant his petition for review and direct the BIA to stay his removal until he has a chance to complete "the process" for a provisional unlawful presence waiver of inadmissibility.  But we lack jurisdiction to review whether Madjitov is entitled to a provisional unlawful presence waiver, as he did

14

not raise it before the BIA in his motion to reopen.  *See Amaya–Artunduaga*, 463 F.3d at 1251; *see also Faddoul*, 37 F.3d at 190.  Although Madjitov appears to challenge the INA's requirement that he raise his claims for relief before the agency, a previous panel of this Court ruled that the motion-to-reopen procedure in immigration proceedings does not violate the Suspension Clause, and its decision has not been overruled.  *See Alexandre*, 452 F.3d at 1206; *Archer*, 531 F.3d at 1352.  Therefore, we are bound by precedent to hold we have no jurisdiction over this claim and must dismiss this part of Madjitov's petition.

**PETITION DISMISSED IN PART AND DENIED IN PART.**