[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-13474

_____

Agency No. A216-031-223

ANGEL VASQUEZ GARCIA,
AXEL VASQUEZ NORIEGA,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(December 9, 2020)

Before MARTIN, NEWSOM, and JULIE CARNES, Circuit Judges.

PER CURIAM:

This is the appeal of a father, Angel Vasquez Garcia (Angel), and his adult son, Axel Vasquez Noriega (Axel), from a decision of the Bureau of Immigration Appeals (BIA) dismissing their appeal of an immigration judge's (IJ) denial of their petitions for asylum, withholding of removal, and protection under the United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT).  Angel and Axel are Venezuelan citizens alleging that they have been victims of political persecution by the Venezuelan government. After careful consideration, we affirm the BIA's decision to deny relief to Angel, but we remand for clarification as to Axel's past-persecution claim.

## I

## A

In August 2017, the Department of Homeland Security (DHS) issued a notice to appear (NTA) charging Axel with removability under 8 U.S.C. § 1182(a)(7)(A)(i)(I) for being an alien without a valid entry document at the time of his application for admission.  DHS issued a similar NTA to Angel the following month, and both Angel and Axel conceded removability.  They applied for asylum, withholding of removal, and CAT protection,[1] alleging past persecution and a fear of future persecution based on their political beliefs.

---

[1] Angel and Axel have abandoned any CAT-related arguments on appeal—although they included the standard for CAT relief in their brief, they don't challenge the BIA's ruling on that claim in any way.  *See, e.g.*, *Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1228 n.2 (11th Cir.

Specifically, Angel and Axel claimed that they were opponents of "the socialist, totalitarian government of Venezuela," Adeco (Democratic Action) Party sympathizers, and active members of the "Primero Justicia" (Justice First) opposition movement. They alleged that their wife/mother, Yeasse Noriega de Vazquez (Yeasse), was injured by a government vehicle that drove into a crowd of protestors and that Axel "was injured by a projectile shot by government forces." Further, they stated that a neighbor warned them that they were going to be detained by the authorities—this warning, they said, prompted them to flee to Colombia, and ultimately to seek refuge in the United States.

Angel and Axel attached several exhibits to their applications, including affidavits detailing the events prompting their flight to the United States. One affidavit was from Yeasse, in which she stated that she and her family are "strongly opposed to the current government and its abuses towards anyone who is not a member of their party" and had "been victims of violent persecution" from the Venezuelan government. Yeasse said that she had traveled to the United States the previous year following the death of a friend—who she alleges was killed by the Venezuelan government—but that she returned to Venezuela several months later. After her return, she said, neighbors who "were well connected with

2005) (holding that failure to challenge denial of CAT relief in a brief abandons the issue on appeal).

3

government sources" warned her that government agents were coming for her—this prompted her family's flight back to the United States.

Angel and Axel also included an affidavit from a neighbor in their residential building, Yanet Urdaneta Gonzalez (Urdaneta), who attested to the family's anti-government activities. She noted a conversation that took place over a WhatsApp group chat for residents in their building, in which criticisms arose of Axel's participation in nearby protests. Urdaneta said that the conversation caused the government to target Angel and Axel's family, and it was her warning that prompted them to flee Venezuela.

In addition, Angel and Axel submitted declarations that they were active members of Primerio Justicia, medical records documenting Yeasse's protest-related injuries, medical records detailing Axel's injury from a non-lethal projectile wound in his left thigh, and photographs depicting these injuries and local protests. Finally, they included country-condition reports detailing how the Venezuelan government frequently attacks, detains, and tortures political opponents and protestors, as well as how the Bolivian National Guard and Bolivian National Intelligence Service (SEBIN) have detained and abused hundreds of government opponents in Venezuela. These reports noted that security forces often use nonlethal weapons like teargas and pellets to break up protests.

4

**B**

An IJ conducted a consolidated hearing for Angel and Axel.  Angel testified

at the hearing; Axel did not. Angel stated that he and his family fled to the United

States after learning from a neighbor that a couple who lived in their building was

affiliated with SEBIN, which was planning to search their home.  They left

promptly out of fear that they would be detained and tortured, but Angel couldn't

say whether SEBIN or other government agents ever actually came to their home.

After some probing, Angel said the following when questioned about whether he

had been physically harmed in Venezuela:

> Yes.  Yes.  During protests.  I mean, with the bombs and the rocks
> that even the police throws and with the BB guns.  If it didn't hit me,
> that's something different but yes, during the protests. . . . It didn't
> injure me but they, they hit me.  A [tear gas] bomb was dropped right
> by my feet and by luck I didn't—I wasn't asphyxiated by it.

Yeasse also testified.  She discussed her neighbors' WhatsApp group chat,

noting that on the day the family fled Venezuela her neighbors had been discussing

a young man who had been seen going to and coming from a protest.  Yeasse said

that one unnamed neighbor was particularly concerned and that Yeasse had asked

her whether she thought Axel was the man in question.  Yeasse explained that the

neighbor then removed herself from the group chat—later, Yeasse testified,

Urdaneta told her that this neighbor was affiliated with the government and that the

government was coming after her family as a result of Axel's participation in the

5

protest.  In response, Yeasse said that her family packed their belongings and left their home a short ten minutes later.  She wasn't able to confirm whether the authorities ever showed up at her home.

Yeasse also testified about the photos of her son's injuries, alleging that "[t]he national guard shot [her] son on his leg."  Angel and Axel's counsel later clarified, however, that although Axel "was shot at a protest," the family didn't "know who pulled the trigger in particular."  "All [they] know," he said, "is that no one who is not in the government is armed in Venezuela" and that "[o]nly government and their supporters have firearms."  Yeasse also discussed a citation that her small business received from the Venezuelan government, explaining that if she wasn't in the country her business wouldn't be able to operate.  She speculated that this citation was an attempt by the government to get her to come back to Venezuela "because they want to get [her]."

## C

Although the IJ found that the testimony presented at the hearing was credible and consistent, he ultimately denied Angel's and Axel's petitions.  First, the IJ held that Angel and Axel hadn't shown past persecution.  With respect to Angel's petition, the IJ found that there wasn't any evidence that he had been physically harmed in Venezuela or that he had ever been personally threatened by anyone affiliated with the government.  Rather, his fear was based on his

6

neighbor's warning, and there was no evidence that this warning "turned out to be true." The IJ stated that although Angel and Axel had "lived in Venezuela for virtually all of their lives . . . there is no evidence that the authorities or SEBIN had ever come to [their] house to arrest them or to detain them or to harm or kidnap them or to do anything improper to them while they lived in Venezuela."

With respect to Axel, the IJ acknowledged that there was "testimony that he was shot while attending a protest," but he found that "[t]here [was] little evidence in the record to identify who may have shot" Axel. The IJ said he could not "just . . . assume that it must have been the government because the overwhelming evidence is that only the government and its supporters have guns in Venezuela," as that "notion . . . simply ha[d] not been established in any credible way." Thus, the IJ held that "there [was] no evidence that [Angel] was shot because of his political or imputed political opinion." Ultimately, the IJ concluded, he was "left to speculate about far too much in this case to find that the respondents had met their burden of showing that they suffered harm rising to the level of persecution."

Likewise, the IJ held that Angel and Axel hadn't established "an objective basis to fear future persecution in Venezuela . . . based on any ground that is protected by the" INA. The IJ found that their subjective fear of persecution wasn't objectively reasonable considering the lack of evidence that anyone from the government had actually come to their home after they fled. Because they

7

hadn't met the standard for asylum, the IJ held that their claims for withholding of removal and CAT protection also failed.

## D

Angel and Axel appealed to the BIA. The BIA dismissed their petitions. It "agree[d] that the respondents did not establish a nexus to any protected ground for purposes of establishing past persecution or a well-founded fear of persecution, based on the described events." The BIA observed that Angel "was not harmed physically in Venezuela" and that Axel, "who could not identify the individual who shot him with a BB gun at the protest, did not show that anyone was motivated to harm him based on a statutory ground." With respect to future persecution, the BIA affirmed the IJ's finding that Angel's and Axel's fear of future persecution wasn't objectively reasonable, as it "was based on secondhand or thirdhand information from neighbors." The BIA also affirmed the IJ's findings on withholding of removal and CAT protection.

Angel and Axel appealed to this Court, challenging the BIA's dismissal of their petitions on the grounds that they hadn't established either past persecution or a well-founded fear of future persecution. As a threshold matter, the government contends that Angel and Axel failed to exhaust several of their arguments on appeal. We will discuss exhaustion first, followed by Angel's and Axel's claims, in turn.

8

## II

## A

"We lack jurisdiction to review final orders in immigration cases unless 'the alien has exhausted all administrative remedies available to the alien as of right.'" *Indrawati v. U.S. Att'y Gen.*, 779 F.3d 1284, 1297 (11th Cir. 2015) (quoting 8 U.S.C. § 1252(d)(1)). If a petitioner does not raise a claim before the BIA, he has failed to exhaust his administrative remedies with respect to it. *See Amaya-Artunduaga v. U.S. Att'y Gen.*, 463 F.3d 1247, 1250 (11th Cir. 2006). The exhaustion doctrine is meant to provide the BIA with "a 'full opportunity' to consider the petitioner's claim and to compile a record that will be adequate for future judicial review." *Jeune v. U.S. Att'y Gen.*, 810 F.3d 792, 800 (11th Cir. 2016) (quoting *Amaya-Artunduaga*, 463 F.3d at 1250).

Exhaustion "is not a stringent requirement." *Indrawati*, 779 F.3d at 1297. "Simply put, petitioners must have previously argued the core issue[s] now on appeal before the BIA." *Id.* (internal quotation marks and citation omitted). In doing so, the alien must "set out any discrete arguments he relies on in support of [his] claim." *Jeune*, 810 F.3d at 800. "Unadorned, conclusory statements do not satisfy this requirement, and the petitioner must do more than make a passing reference to the issue." *Id.* (internal quotation marks and citation omitted). But "exhaustion does not require a petitioner to use precise legal terminology or

9

provide well-developed arguments to support his claim"—he just has to do enough to "provide information sufficient to enable the BIA to review and correct any errors below." *Id.* (internal quotation marks and citation omitted).

**B**

The government argues that Angel and Axel failed to exhaust several arguments they make on appeal by not raising them sufficiently before the BIA. Rather than filing briefs with the BIA, the petitioners merely included a bulleted list of their challenges to the IJ's order in their notice of appeal. Although Angel and Axel's arguments weren't artfully drafted, we conclude that they nevertheless satisfy the low bar for administrative exhaustion.

With respect to their argument that they established a sufficient nexus between their alleged persecution by government-affiliated actors and their political opinion, Angel and Axel's notice of appeal clearly referenced the "abundance of evidence on the record as to the[ir] full-throated and very militant opposition" to the Venezuelan government and the "ample documentation" of the Venezuelan government's targeting of political opponents. It also explicitly challenged the IJ's findings that Angel was never physically harmed in Venezuela and that Axel hadn't demonstrated that he was shot because of his political opinion. We think this was enough to raise the core of Angel and Axel's past-persecution arguments before the BIA.

Likewise, Angel and Axel sufficiently exhausted their claims as to their fear of future persecution. Their notice of appeal challenged the IJ's findings that their fears were based on hearsay, that there wasn't any evidence that SEBIN or other government officials came to their home after they fled to the United States, and that their fears of persecution weren't "borne out." These statements were sufficient to enable the BIA to review their arguments pertaining to their fear of future persecution. We will proceed, therefore, to the merits of their claims.

### III

### A

"When the BIA issues a decision, we review the BIA's decision, except to the extent that the BIA has expressly adopted the IJ's decision." *Ruiz v. Gonzales*, 479 F.3d 762, 765 (11th Cir. 2007). "In that instance, we review the IJ's decision as well." *Id.* We review the BIA's factual determinations under the substantial-evidence standard, *Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1230 (11th Cir. 2005), and its "administrative findings of fact are conclusive unless any reasonable adjudicator would be *compelled* to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B) (emphasis added). Under this "highly deferential" standard, we "must affirm the BIA's decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Adefemi v. Ashcroft*, 386 F.3d 1022, 1026–27 (11th Cir. 2004) (en banc) (internal quotation marks and

11

citation omitted).  And "we view the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision." *Id.* at 1027.  "[W]e cannot find, or consider, facts not raised in the administrative forum, nor can we reweigh the evidence from scratch."  *Id.* (internal quotation marks and citation omitted).

The BIA fails to "give reasoned consideration to a claim when it misstates the contents of the record, fails to adequately explain its rejection of logical conclusions, or provides justifications for its decision which are unreasonable and which do not respond to any arguments in the record." *Jeune*, 810 F.3d at 803; *cf. Tan v. U.S. Att'y Gen.*, 446 F.3d 1369, 1376–77 (11th Cir. 2006).  The BIA and IJ needn't specifically address every claim or piece of evidence, but they do have to consider all of the evidence presented and issues raised and "announce [their] decision[s] in terms sufficient to enable a reviewing court to perceive that [they] ha[ve] heard and thought and not merely reacted."  *Tan*, 446 F.3d at 1374 (internal quotation marks and citation omitted).

**B**

To be eligible for asylum and withholding of removal, an alien must qualify as a "refugee."  *See* 8 U.S.C. § 1158(b)(1)(A).  A "refugee" is a person "who is unable or unwilling to return to" his home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality,

12

membership in a particular social group, or political opinion." *Id.*

§ 1101(a)(42)(A). The applicant has the burden of proof to demonstrate eligibility

for relief and to "establish that race, religion, nationality, membership in a

particular social group, or political opinion was or will be at least one central

reason for persecuting the applicant." *Id.* § 1158(b)(1)(B)(i).

Applicants for asylum can meet their burden of proof in one of two ways—

either (1) "by demonstrating past persecution" or (2) by demonstrating a well-

founded "fear of future persecution." *De Santamaria v. U.S. Att'y Gen.*, 525 F.3d

999, 1006–07 (11th Cir. 2008); *see also Najjar v. Ashcroft*, 257 F.3d 1262, 1287

(11th Cir. 2001). "To establish asylum based on past persecution, the applicant

must prove (1) that [he] was persecuted, and (2) that the persecution was on

account of a protected ground." *De Santamaria*, 525 F.3d at 1007. In addition, the

applicant must show that his persecutors were either affiliated with the government

or part of a force that the government is unwilling or unable to control. *Ruiz v.

U.S. Att'y Gen.*, 440 F.3d 1247, 1257 (11th Cir. 2006). Although a petitioner need

not show "direct proof of his persecutors' motives," he does have to demonstrate

"some evidence of it, direct or circumstantial." *INS v. Elias-Zacarias*, 502 U.S.

478, 483 (1992) (emphasis omitted).

To establish a well-founded fear of future persecution on account of a

protected ground, an applicant needs to demonstrate that his fear is "subjectively

13

genuine and objectively reasonable." *Silva v. U.S. Att'y Gen.*, 448 F.3d 1229, 1236 (11th Cir. 2006) (quotation omitted). If an asylum applicant meets the requirements for demonstrating past persecution, he establishes a rebuttable presumption that he also has a well-founded fear of future persecution. *De Santamaria*, 525 F.3d at 1007. "The subjective component is generally satisfied by the applicant's credible testimony that he or she genuinely fears persecution. In most cases, the objective prong can be fulfilled either by establishing past persecution or that he or she has a good reason to fear future persecution." *Sanchez Jimenez v. U.S. Att'y Gen.*, 492 F.3d 1223, 1232 (11th Cir. 2007) (quotation omitted). This requires the applicant to "present specific, detailed facts showing a good reason to fear that he or she will be *singled out* for persecution on account of" a protected ground. *See Najjar*, 257 F.3d at 1287 (emphasis in original) (internal quotation marks and citation omitted).[2]

---

[2] To establish eligibility for withholding of removal, an applicant must establish that his "life or freedom would be threatened" because of persecution on account of a protected ground. 8 U.S.C. § 1231(b)(3)(A). This provision has been interpreted as requiring that the applicant demonstrate that it is "more likely than not" that he will be persecuted if he returns to his home country. *Tan*, 446 F.3d at 1375 (quotation omitted). "This standard is more stringent than the well-founded fear of future persecution required for asylum"—if an applicant fails to establish that element of an asylum claim, he likewise fails to meet the standard for withholding of removal. *Id.* (internal quotation marks and citation omitted).

**IV**

Both Angel and Axel challenge the BIA's findings as to past persecution and fear of future persecution. We affirm as to Angel, but for reasons we will explain, we remand for clarification as to Axel's past-persecution claim.

**A**

**1**

Angel argues that he suffered past persecution in Venezuela, in light of his near-miss incident with a tear gas bomb at a protest. But, as the BIA explained in its order, Angel hasn't presented any evidence that he was actually harmed by the government—or anyone, for that matter—and the evidence of threats against him and his family were all "based on secondhand or thirdhand information from neighbors." We have affirmed the dismissal of petitions involving more concrete threats and actual physical harm. *See, e.g.*, *Djonda v. U.S. Att'y Gen.*, 514 F.3d 1168, 1174 (11th Cir. 2008) (holding that the record did not compel a finding of past persecution for a petitioner who suffered a "minor beating" and was verbally threatened by government loyalists); *Silva*, 448 F.3d at 1237–38 (holding in a case where the petitioner received written death threats, threatening phone calls, and was shot at while driving, that the evidence did not compel the conclusion that she had been targeted on account of her political opinion); *Sepulveda*, 401 F.3d at 1229, 1231 (holding in a case where an activist received death threats and had a

15

bomb set off at her place of work, that "[a]lthough the evidence may permit a conclusion [that] the . . . bombing was directed at [her] on account of her political activity, it d[id] not compel such a conclusion"). We hold, therefore, that in Angel's case, substantial evidence supports the BIA's rejection of his past-persecution claim.

**2**

We likewise find that substantial evidence supports the BIA's finding that Angel hasn't established a well-founded fear of future persecution. Angel has not submitted any compelling evidence that he would be singled out for persecution if he returned to Venezuela. *See, e.g.*, *Sepulveda*, 401 F.3d at 1231–32 (affirming a finding of no well-founded fear of future persecution, even though the petitioner was an activist leader, because "the evidence d[id] not indicate her notoriety as an activist would outlast her four-year absence from Colombia" and her "opposition to guerilla violence was shared by hundreds of thousands of people . . . who marched in protest"). Indeed, the only evidence of threats made against Angel came from secondhand warnings passed along by his neighbors—there's no indication that any of those threats were ever carried out. The citation received by Yeasse's business is far too vague for us to speculate that it is a government ploy to get the family back in Venezuela, and the country reports indicate that that the Venezuelan government engages in "widespread" suppression of thousands of anti-

government protestors on a regular basis.  Substantial evidence therefore supports

the BIA's determination that Angel's fear of future persecution was not

"objectively reasonable."[3]

**B**

Next, we must evaluate Axel's arguments on appeal.  Like Angel, Axel

contests the BIA's dismissal of his claims of past persecution and fear of future

persecution.  On its face, Axel's past-persecution case seems more compelling than

Angel's, in that the evidence shows that he was injured by a non-lethal projectile at

an anti-government protest.  But showing that he was shot isn't enough on its

own—Axel must also provide evidence of (1) *Who* shot him? and (2) *Why*?  As

already explained, the "who" needs to be someone affiliated with the government

or a force the government is unwilling or unable to control, and the "why" needs to

demonstrate a nexus to a protected ground—here, Axel's political opinion.  *Ruiz*,

440 F.3d at 1257–58.

The evidence regarding both questions—the "who" and the "why"—is

equivocal.  Because Axel didn't testify at the evidentiary hearing, the only

testimonial evidence addressing the "who" question comes from unsubstantiated

assertions in Angel's and Axel's asylum applications and Yeasse's similarly

---

[3] Because Angel hasn't shown a well-founded fear of future persecution for purposes of his asylum claim, he likewise hasn't met the standard for withholding of removal.  *See Sepulveda*, 401 F.3d at 1232–33.

unsubstantiated assertion at the evidentiary hearing.  Notably, though, the petitioners' attorney backtracked on these assertions at the hearing, conceding that the family didn't "know who pulled the trigger in particular."  "All [they] know," he clarified, "is that no one who is not in the government is armed in Venezuela" and that "[o]nly government and their supporters have firearms."  The country-conditions reports that Angel and Axel submitted—which, as they rightly point out, the IJ and BIA did not discuss—do, however, indicate that the Venezuelan government regularly uses non-lethal projectiles against anti-government protestors.  As to the "why" question, the evidence indicates only that Axel was injured at an anti-government protest, and again, that the Venezuelan government regularly and violently targets its political opponents.

Because the evidence pertaining to the "who" and "why" questions is equivocal, it may well be that BIA's order is due to be affirmed on one ground, the other, or both.  *Cf.* 8 U.S.C. § 1252(b)(4)(B) (noting BIA's "administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary"); *Sepulveda*, 401 F.3d 1230 (holding that we review only for substantial evidence).  Here, though, we find that we cannot adequately review the BIA's order as it stands, because we cannot decipher the basis for its dismissal of Axel's past-persecution claim.  The BIA's consolidated order is a mere two pages long, and it includes only one cryptic sentence

18

explaining its ruling on Angel's past-persecution claim:  "The co-respondent, who could not identify the individual who shot him with a BB gun at the protest, did not show that anyone was motivated to harm him based on a statutory ground."  Is that a ruling that Axel hasn't sufficiently answered the "who" question, or is it a ruling that he hasn't answered the "why" question?  Maybe both?  We cannot tell.  As a result, we remand to the BIA to clarify—and adequately explain—the grounds for its ruling as to Axel's past-persecution claim.[4]

**AFFIRMED IN PART, VACATED AND REMANDED IN PART.**

---

[4] We have remanded to the BIA in similar circumstances before.  *See Cueva v. U.S. Att'y Gen.*, 454 F. App'x 806, 808 (11th Cir. 2012) (detailing procedural history of appeal involving a remand to the BIA to address petitioner's credibility and clarify its rejection of petitioner's claim); *Feng Chai Yang v. U.S. Att'y Gen.*, 283 F. App'x 684, 685 (11th Cir. 2008) (vacating and remanding case to BIA "with directions that it clarify its internal inconsistencies"); *cf. also Indrawati*, 779 F.3d at 1302 (noting that we will remand for reasoned consideration if "given the facts and claims in the specific case before the IJ and the BIA, the agency decision is so fundamentally incomplete that a review of legal and factual determinations would be quixotic" (emphasis omitted)).

MARTIN, Circuit Judge, concurring:

I share the view expressed in the majority opinion that the Board of Immigration Appeals ("BIA") failed to clearly articulate why it denied Axel Vasquez Noriega's asylum claim. But beyond that, I would return Axel's case to the BIA for an additional reason. I believe the Immigration Judge ("IJ") failed to give reasoned consideration in the first instance to the evidence supporting Axel's claim. Specifically, the IJ skipped over record evidence that Axel was shot by government actors. And when determining if Axel established nexus between his injury and his political opinion, the IJ never analyzed the fact that Axel was shot while protesting against the government.

In remanding this case for further consideration, the majority opinion duly notes the evidence the IJ appears to have overlooked. And the majority encourages the BIA to resolve Axel's claim in light of this evidence. But I want to say as well that the IJ should have accounted for this evidence in its original decision. The lack of clarity in the BIA's opinion seems to have roots in the IJ's incomplete decision. I would ask the BIA to vacate its decision and remand for a new evaluation of all the evidence surrounding Axel's asylum claim.

A.  *The IJ failed to account for evidence that Axel was shot by agents of the Venezuelan government.*

To make out a claim of past persecution, Axel was required to show he was persecuted in his home country by government forces or by non-governmental

20

forces that the government could not control. Ruiz v. U.S. Att'y Gen., 440 F.3d 1247, 1257 (11th Cir. 2006) (per curiam). At the IJ hearing, Axel sought to show that he was shot in the leg by the Venezuelan government. After hearing the evidence, the IJ found Axel was not targeted by the Venezuelan government. The IJ rested his decision on a statement by Axel's attorney that "[w]e don't know who pulled the trigger in particular" but only "the government is armed in Venezuela." But in focusing on this statement alone, the IJ ignored credible, countervailing record evidence that supported Axel's claim.

First, the IJ glossed over Yeasse Noriega de Vasquez's testimony that Axel, her son, was shot by the Venezuelan National Guard. Her testimony on this point was unequivocal: "The national guard shot my son on his leg." The record also establishes that Yeasse had personal knowledge of the shooting. She testified at the IJ hearing that "I always went with my son to the protest because I didn't want to take the risk . . . to lose my son and me not being there for him." She also identified a photo of the projectile with which Axel was shot, further confirming she was at the scene of the shooting. Everyone agrees that Yeasse testified credibly.

It is true that Axel's counsel walked back Yeasse's statement about the shooting when pressed. But, to my mind, the IJ still needed to explain why he completely discounted Yeasse's testimony that Axel was shot by the Venezuelan

National Guard.  I believe it was error to credit Yeasse's testimony "but ignore[] the import of that credited testimony."  See Ayala v. U.S. Att'y Gen., 605 F.3d 941, 949 (11th Cir. 2010).

Second, the IJ ignored statements in Axel's asylum application.  The application described that Axel "was injured by a projectile shot by government forces."  Axel's statement was consistent with his mother's credible testimony. See Nreka v. U.S. Att'y Gen., 408 F.3d 1361, 1364 (11th Cir. 2005) (considering statements in both an "application for asylum and [the] testimony before the IJ"); Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1229 (11th Cir. 2005) (per curiam) (same).  Yet the IJ also did not analyze, or even mention, the assertion in Axel's asylum application.

Finally, the IJ did not consider evidence contained in Axel's medical records and the country report.  Axel's medical records indicated that he was shot by a non-lethal projectile from a gun.  The Human Rights Watch country report on political persecution in Venezuela stated that Venezuelan security forces use "less lethal weapons" such as "modified rubber-pellet shotgun shells" on anti-government protestors.  Axel also introduced a picture of the projectile with which he was shot, which the IJ agreed was a non-lethal projectile.  The IJ never mentioned any of this evidence when it decided Axel had not met his burden of showing he was harmed by government actors.

22

As a whole, the IJ's decision did not reflect a consideration of all the evidence that Axel marshaled in his favor. "Although the Immigration Judge is not required to discuss every piece of evidence presented before him, the Immigration Judge is required to consider all the evidence submitted by the applicant." Tan v. U.S. Att'y Gen., 446 F.3d 1369, 1376 (11th Cir. 2006) (citation omitted). I would thus remand to the BIA for reconsideration of Axel's claim of persecution by the Venezuelan government.

B.    *The IJ failed to account for evidence that Axel was shot because of his political opinion.*

To prevail on his claim of asylum for political persecution, Axel needed to establish that his political opinion "was or will be at least one central reason for persecuting [him]." Perez-Zenteno v. U.S. Att'y Gen., 913 F.3d 1301, 1307 (11th Cir. 2019) (quoting 8 U.S.C. § 1158(b)(1)(B)(i)). This requirement of connection between the harms suffered and a statutory protected ground is known as the nexus requirement. See id. at 1312. To show nexus, an applicant must provide some evidence of his persecutors' motives, whether "direct or circumstantial." INS v. Elias-Zacarias, 502 U.S. 478, 483, 112 S. Ct. 812, 816–17 (1992).

At the IJ hearing, Axel argued there was a nexus between his harm and political opinion because he was shot while protesting the Venezuelan government as a registered opposition activist. The IJ, however, found "[t]here is simply no evidence that anyone associated with the government has targeted [Axel] . . . [and]

23

no confrontation between [Axel] and the government . . . at any place that would suggest that the government of Venezuela has identified [him] and has targeted [him] for harm on account of a ground that's protected."

This finding does not, in my view, reflect that the IJ gave reasoned consideration to the evidence Axel presented. Axel introduced evidence of his active, public membership in anti-government opposition groups. And, as set out above, Axel's mother credibly testified that he was shot by a non-lethal projectile while participating in an anti-government protest. The Human Rights Watch country report described that assaulting protesters with non-lethal projectiles is a method of violent political suppression used by the Venezuelan government. Cf. Rivera v. U.S. Att'y Gen., 487 F.3d 815, 821 (11th Cir. 2007) (looking to country reports to determine if substantial evidence supported a finding of nexus). The IJ failed to account for this evidence when deciding the question of nexus. For this reason, too, I would ask the BIA to vacate the IJ's decision and call for further proceedings in his case.

*    *    *

As the majority notes, Axel's asylum case is a close one. See Maj. Op. at 18–19. This is all the more reason why the IJ should have justified its denial of Axel's application by demonstrating it considered all the evidence Axel presented on his behalf. As it stands, I cannot discern why the IJ found this evidence

24

unworthy of discussion.  I join the majority in the hope that the BIA sees fit to take

account of this evidence on remand.

JULIE CARNES, Circuit Judge, concurring:

I concur with the majority opinion remanding this case to the BIA to clarify its basis for affirming the IJ's determination that Axel Vasquez Noriega had failed to shoulder his burden of proving past persecution. I do so not because I believe that the IJ's determination was wrong. To the contrary, I believe that in addressing Axel's allegation that Venezuelan officers had shot him with a non-lethal projectile in the leg, the IJ correctly concluded that there was "nothing in the record to support that." And as a general matter, the findings of fact of the BIA—and of the IJ, to the extent the BIA has adopted those findings—are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary. *Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1230 (11th Cir. 2005). Clearly, given what the IJ accurately characterized as nothing more than a speculative assertion that Axel had been shot by government officers, no reasonable adjudicator would be compelled to conclude that this finding was inaccurate.

Yet, as the majority opinion explains, it is not enough that our court might be able to look at the record and determine that the record supports the IJ's determination that Axel had failed to show that he was shot by government officers. Instead, we must consider and evaluate the BIA's order reviewing the IJ's ruling to determine the BIA's ground for affirming the latter. But when the BIA order fails to adequately explain the basis of its decision, then we are unable to

26

review that decision.  And as the majority explains, because the BIA offered only "one cryptic sentence explaining its ruling on Angel's past-persecution claim," we "cannot decipher the basis for its dismissal."

For that reason, the majority opinion remands the case to the BIA to clarify and adequately explain the grounds for its ruling—and the majority opinion does so in a neutral fashion.  In her concurring opinion, however, Judge Martin places a very heavy thumb on the scale, essentially directing the BIA as to how it should rule on remand.  In essence, my respected colleague seems to be telling the BIA to reverse the IJ's determination that Axel had failed to prove past persecution.

I concur fully in the majority opinion, and it will be a task for the agency to assess the evidence for itself on remand.  Yet, lest the BIA come away from Judge Martin's concurrence with the false impression that this panel is telegraphing its belief that Axel should prevail on remand, I write separately to address what I believe to be Judge Martin's flawed reading of the record.  And given Judge Martin's not-so-subtle attempt to pave a path that would allow Axel to prevail below, I feel obliged to note that my own reading of the record is greatly at odds with hers.

Axel's Absence of Proof that Venezuelan Officers Shot Him

In support of his petition for asylum, Axel claims that he suffered past persecution because he was shot in the leg with a non-lethal projectile during a

27

political protest.  To prevail on this claim, he must identify "specific and credible evidence" demonstrating that government agents persecuted him in the past "on account of a statutorily listed factor."  *Ruiz v. U.S. Att'y Gen.*, 440 F.3d 1247, 1257 (11th Cir. 2006) (emphasis added) (alteration accepted) (quotation marks omitted).  Translating the above:  one claiming past persecution must show that government agents acted against the claimant in a manner so severe that it rose to the level of persecution, and that this governmental action was taken based on a prohibited ground—which here was Axel's political opinion.

Applying that test here, Axel was required to show, among other things, that his shooter was a government agent and that the shooter fired the non-lethal projectile at him because of his anti-government political opinion.  This is a tall order, given that Axel inexplicably chose not to testify at his own immigration hearing, leaving the record—and the presiding IJ—bereft of any testimony describing the circumstances under which Axel was injured:  a context that Axel was obliged to  provide in order to show the likely identity of the shooter, as well as the latter's reasons for his actions.

Yet, all Axel offered the IJ was a bare assertion that he had been shot by government agents in order to persecute him for his political opinion.  Instead of proof, Axel offered only speculation.  First, Axel asserted in his asylum application—without further elaboration—"I was injured by a projectile shot by

28

government forces." Judge Martin faults the IJ for ignoring this statement. But one wonders what the IJ was supposed to do with this conclusory assertion when Axel's statement provided no factual content to support that conclusion, and when he then declined to testify and provide that support. Axel's asylum application fails to describe even basic information about the circumstances of his injury that might have allowed the IJ to infer that a government agent was responsible for the shooting. Axel does not explain where he was or what he was doing when he was shot. Nor does he describe the individual who shot him or how he knew the shooter was a government agent. Indeed, Axel's terse statement in the application leaves open the possibility that whoever shot him did so unintentionally.

Of course, an applicant's failure to provide a detailed account of the facts underlying a past persecution claim is not necessarily fatal, given that applicants generally have an opportunity to present testimony at a hearing before an IJ. But here Axel declined to testify and he did not otherwise provide the factual basis necessary for the IJ to endorse his claim that a government officer had shot him.

At the hearing itself, Axel's mother testified. Other than a single conclusory remark indicating her belief that her son had been shot by government agents, she offered no information about the circumstances leading up to her son's injury. Specifically, after having been asked to identify a photograph, the mother identified the image as being "a bullet from a BB gun that was shot." She then

29

volunteered, "The national guard shot my son on his leg."  And in a record that

contains 29 pages of testimony, that <u>one</u> sentence is the sum total of evidence

presented in support of Axel's allegation that a Venezuelan officer shot him at a

protest rally.

In volunteering the statement, "The national guard shot my son," the mother

never claims any personal knowledge of the event.  She gives no hint as to the

basis for this assertion, never stating that she had seen the incident or was even

present at a protest on June 20—the date that Axel went to the emergency room

with an injury from a non-lethal projectile[1]  Judge Martin reasons that the mother

must have been at the protest at which Axel was shot based on a different part of

her testimony when the mother stated that she always "went with my son" to

protests.  This latter testimony occurred as the mother was explaining that a

presumably pro-government neighbor was upset because "we were part of the

---

[1] The mother testified that she herself was injured at a protest called "Block Your Street" or "Close Your Street," when, while attempting to block a street, she was holding up a rope when an approaching truck drove by her causing the rope to hit her neck, which created abrasions and cuts.  The mother suspected the truck was being driven by someone from the government because the police did not aid her.  This protest, however, occurred on a different date than the protest at which Axel was allegedly shot, as the medical report generated as to the mother's injury was dated "June 23, 2017," not "June 20," which was the date of Axel's injury.  Specifically, the June 23 report generated for the mother indicated that she had "suffered a physical attack for which she was brought to this center <u>on an emergency basis</u>." (emphasis added).  The report indicated that she had suffered "acute chocking (sic) injury," "acute thoraxic (sic) contusion," and "multiple excoriations."

[June 30] protest."[2]  In explaining the "we" reference, the mother added,  "And I always went with my son to the protest because I didn't want to take the risk that—for—to lose my son and me not being there for him."

But this is a far cry from testimony that she actually observed the events that led to Axel's being shot.  And, in fact, during this same sequence of testimony, the mother contradicts her own statement that she was always present with Axel when he attended a protest.  The mother testified that during the June 30 "WhatsApp" colloquy between neighbors, a neighbor expressed her disapproval of the fact that a young man was going back and forth from the apartment building, presumably in support of the ongoing protest.  In response to this complaint, Axel's mother—quite oddly—saw fit to point out to a displeased pro-government neighbor that it was probably her own son, Axel, whom the neighbor had seen.  The mother states that during this colloquy, "you know, I was at my house doing my thing.  The protest was going on." (emphasis added).  So, as Axel was "coming and going" from and to the protest,[3] the mother remained in her home.  Thus, it's clear that, at least as to this protest, the mother was not in attendance, meaning she did not

---

[2]  The protest, as well as the conversation with the neighbor, occurred on June 30, 2017.  The entire family left Venezuela, heading for America, that evening.  Axel's injury had occurred on June 20.

[3]  She explained that Axel "was coming and going" because he was gathering materials to help in his fight with the Government forces:  "the young people—what they do is they find whatever they can in order to help them with the fight.  They find tires, or, or wood—whatever they can use."

attend every protest attended by Axel. Nor did she ever testify that she was in fact present on the specific day when he was allegedly shot or otherwise offer any basis for her belief that Axel had been shot by the national guard.

Indeed, even Axel's counsel did not interpret the mother's testimony as evidence that government forces were responsible for Axel's injury. Struggling to identify the evidentiary support for Axel's contention that government forces had shot him, the IJ asked counsel his position as to who shot Axel. Counsel responded, "He was shot at a protest, Your Honor. We don't know who pulled the trigger in particular. . . . All we know is that no one who is not in the government is armed in Venezuela. Only government and their supporters have firearms." If counsel had interpreted the mother's testimony the way Judge Martin does—as "unequivocal" evidence that a member of the national guard shot Axel—counsel undoubtedly would have cited that testimony rather than conceding that "we don't know who pulled the trigger."

With this concession, counsel clarified that the mother's testimony that the national guard shot her son should not be interpreted as meaning that she saw it happen, but instead that it was the mother's belief that this was so. The IJ properly relied on that concession. As to Axel's position that it must have been a member of the national guard who shot him with the projectile, Axel offered no evidence concerning what actually happened at the rally, which evidence might have

32

provided the necessary context to support his suggested inference.  And it would have been so easy for Axel to offer that information through his own testimony.  For example, where was Axel standing or marching when this happened?  He was hit in the upper thigh; was he at the front of the line?  Did he see people who appeared to be government forces?  A lot of them?  Did they seem to have weapons?  Was he the only person shot?  What events preceded his being shot?  What was he doing at that time?  Were he and his fellow marchers peaceably protesting or were he, or they, engaged in any violence against the officers?  Were multiple shots fired?  What happened after he was shot?

Axel's failure to provide any information concerning what led up to his being shot likewise impacted his burden to show that he was persecuted on account of his political beliefs.  It is true that the Human Rights Report indicated that the Venezuelan government has often used excessive force to suppress anti-government protests:  "Security forces have used less-lethal weapons—such as water cannons, teargas, and pellets—in ways that seemed deliberately intended to inflict painful injuries."  The Report, however, also confirmed that there had been reports of protestors inflicting violence on government officers during protests, including the use of rocks, Molotov cocktails, weaponized fireworks, and homemade mortars and explosive devices during clashes with security forces.  On that score, Axel's mother seemed to confirm that violence was sometimes used by

33

the protestors.  As noted, in explaining Axel's activities during the protest that was the subject of the conversation between the mother and her pro-government neighbor, the mother testified that Axel "was coming and going because [] during this protest the young people—what they do is they find whatever they can in order to help them with the fight.  They find tires or, or wood—whatever they can use."

Government forces sometimes apply force against protesters based on non-persecutorial motives, such as the need to control unlawful violence exhibited by the protestors.  Yet, once again, Axel's failure to offer any evidence concerning the event at the heart of his claim of past persecution makes it impossible to gauge the motivation behind any force that may have been directed against him.

In conclusion, the BIA will have an opportunity on remand to explain more clearly its determination whether Axel has carried his burden to establish that he was shot by government agents with a non-lethal projectile, that such a shooting would meet the legal definition of persecution under all the circumstances, and that there was a nexus between the shooting and Axel's political opinion.  As Judge Martin has offered her interpretation of the evidence in this case and as I disagree with that interpretation, I have offered my own take on this evidence.  Ultimately, though, the BIA will be required to make its determination, stating with greater clarity its reasoning.

34